682 F.2d 1338
 Tirso del JUNCO, Walter L. Rasic, Andres Alonzo, Jr., C. V.
Holder, Martin Castillo, Grace C. Quinn, Antonio
E. Valle, Gilbert R. Vasques, Hal W.
Brown, Jr., Petitioners-Appellants,
v.
C. T. CONOVER,* Comptroller of the Currency,
Office of the Comptroller of the Currency,
Department of the Treasury,
Respondents-Appellees.
 No. 81-7466.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 5, 1982.
Decided July 30, 1982.
 
 Patrick McAdam, Iverson, Yoakum, Papiano & Hatch, Los Angeles, Cal., for petitioners-appellants.
 Howard Neil Cayne, Arlington, Va., for respondents-appellees.
 Petition for Review of an Order of the Comptroller of the Currency.
 Before FLETCHER, PREGERSON and REINHARDT, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 In December 1979, a periodic examination by the Comptroller of the Currency ("Comptroller") of the Los Angeles National Bank ("Bank") disclosed a possible violation of the provisions of 12 U.S.C. § 84. Section 84 limits the amount that a bank can lend to a single borrower to 10% of the bank's capital stock.[1] At issue was whether three of the Bank's loans were really to the same entity and whether, when added together, they exceeded the bank's legal lending limit.
 
 
 2
 The loans were to Rehbock Lewis ("Lewis"), President of Fame Furniture Co., Inc.; Fame Furniture Co., Inc. ("Fame"); and Ralph Ware ("Ware"), Treasurer of Fame. The chart below sets forth the date, borrower, and amount of each loan, as well as the legal lending limit of the bank at the time of each loan and the amount by which the loans, when aggregated, exceeded the legal lending limit:[2]
 
 
 3
 The legality of the Lewis loan for $225,000 has never been at issue, as that loan did not exceed the legal lending limit of the bank when it was made. However, if the Lewis, Fame, and Ware loans could be aggregated, then the latter two loans would exceed the Bank's lending limit.
 
 
 4
 The Comptroller first requested the Directors of the Bank to indemnify the Bank for any losses sustained as a result of the two excess loans; the Directors refused. The Comptroller then began a formal cease and desist action against the Directors and the Bank by issuing a Notice of Charges. The Bank and Directors answered, and the Comptroller moved for summary judgment in an agency proceeding.
 
 
 5
 In the agency proceeding, the Bank and Directors admitted that they knew that the proceeds of the Fame and Lewis loans were to be used for the benefit of Fame. On these facts, the Administrative Law Judge (ALJ) ruled that it was proper to aggregate the Lewis and Fame loans so as to constitute a violation of 12 U.S.C. § 84. He also ruled, however, that an evidentiary hearing would be necessary to determine whether the proceeds of the Ware loan were actually used for the benefit of Fame, an element that had to be satisfied if the Ware loan could be added to the Fame loan. Such an evidentiary hearing was then held, and the ALJ determined that the Ware loan was used for the benefit of Fame. Accordingly, the ALJ recommended that the Comptroller issue a cease and desist order, that the Directors indemnify the Bank for the Fame and Ware loans, that the Bank recover costs of collection fees, and that the Bank recover attorneys' fees that it had paid for the Directors' defense.
 
 
 6
 Although the Comptroller agreed with the ALJ's findings, he disagreed as to the proper construction of section 84 with regard to reducing the Directors' liability. Both the Comptroller and the ALJ agreed that the potential liability of the Directors equalled $350,000, the sum of the two excess loans. The ALJ would have permitted the Directors to reduce their liability of $350,000 by offsetting a checking account of Fame and by selling bonds assigned as security to the Ware loan. The Comptroller, however, concluded that the Directors' potential $350,000 liability could not be reduced by the Bank's recoveries until the legal but unsecured Lewis loan had been fully repaid with interest.[3]
 
 
 7
 The Directors then moved this court to stay the Comptroller's final judgment. This court denied the motion without prejudice. Next, the Directors filed an identical motion with the Comptroller, who denied the motion. The Directors now appeal the final judgment of the Comptroller.
 
 ISSUES
 
 8
 1. What is the proper standard for reviewing the Comptroller's fashioning of a remedy?
 
 
 9
 2. Did substantial evidence support the Comptroller's finding that the proceeds of the loan made by the Bank to Ware were used for the benefit of Fame in violation of the lending limit imposed by 12 U.S.C. § 84?
 
 
 10
 3. Were the remedial measures required by the Comptroller appropriate to correct conditions resulting from the Directors' violation of 12 U.S.C. § 84?
 
 
 11
 I. STANDARD OF REVIEW.
 
 
 12
 The parties agree that a "substantial evidence" standard applies to judicial review of administrative findings. The parties are correct. See 5 U.S.C. § 706(2)(E).
 
 
 13
 The Comptroller has broad discretion to fashion a remedy. See Groos National Bank v. Comptroller of Currency, 573 F.2d 889, 897 (5th Cir. 1978). "Substantial evidence is required for the Comptroller's findings, but once the Comptroller finds a violation he may, within his allowable discretion, fashion relief in such a form as to prevent future abuses." Id. Similarly, he has broad discretion to cure the effect of a violation.
 
 
 14
 In reviewing the order that actually issued, we consider whether the affirmative action taken by the Comptroller was appropriate to correct the condition resulting from the Directors' violation of the banking laws.[4]II. THE COMPTROLLER'S FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE THAT THE PROCEEDS OF THE LOAN MADE BY THE BANK TO WARE WERE USED FOR THE BENEFIT OF FAME IN VIOLATION OF THE LENDING LIMIT OF 12 U.S.C. § 84.
 
 
 15
 The regulation that implements the lending statute provides that "(o) bligations of a corporation must be combined with any other extension of credit the proceeds of which are used for the benefit of the corporation." 12 C.F.R. § 7.1310(c)(3) (1981) (emphasis added). The issue presented by this regulation is whether there was substantial evidence to support a finding that the $125,000 loan to Ware, the Treasurer of Fame, was "used for the benefit of the corporation."
 
 The Comptroller found:
 
 16
 The hearing record clearly discloses the purpose and use of proceeds of the Ware loan. Mr. Ware, Fame's treasurer, testified that Fame's checking account at another bank was overdrawn. Accordingly, he and Mr. Lewis, Fame's president, went to the Bank to procure another loan. The Bank's vice president and senior lending officer, Mr. Jewett, informed Lewis and Ware that the Bank could not make an additional loan to Fame or to Mr. Lewis without violating the Bank's legal lending limit. Therefore, Mr. Ware's "name was used for the loan papers to borrow the money." Hearing Transcript 50-51. As agreed, the Bank put the Ware loan proceeds directly into Fame's corporate checking account. Hearing Transcript 51-52. See also Hearing Transcript 179-80, wherein Mr. Jewett testified that he knew the proceeds were "going to go through Mr. Ware to Fame." On these facts, the Comptroller agrees with the ALJ's finding and conclusion that the deposit of the Ware loan proceeds directly into Fame's corporate checking account shows that the proceeds were used for the benefit of Fame.
 
 
 17
 The evidence of the corporation's overdrawn account, the corporation's search for another loan, the action and knowledge of the Bank's lending officer, and the deposit of the loan proceeds directly into Fame's account is substantial enough to support the Comptroller's finding.
 
 
 18
 Thus, because sufficient evidence supported the finding that the Ware loan was for the benefit of Fame, that loan could be aggregated with other Fame loans to calculate whether an excess loan had been made.
 
 
 19
 III. THE REMEDIAL MEASURES REQUIRED BY THE COMPTROLLER WERE APPROPRIATE TO CORRECT CONDITIONS RESULTING FROM THE DIRECTORS' VIOLATION OF 12 U.S.C. § 84.
 
 
 20
 The Directors attack the remedy sought by the Comptroller in Article II of the cease and desist order.[5] The Directors argue that (a) indemnification is an improper remedy because the Directors did not "knowingly violate" the banking laws; (b) if indemnification is a proper remedy, then the Directors must be allowed to reduce their liability on the illegal loans by offsetting a checking account and selling collateral, even though the legal unsecured loan remains unpaid; (c) the Comptroller lacks authority to order that collection and attorneys' fees be paid to the Bank.
 
 
 21
 A. The Directors Knowingly Violated the Lending Requirements of 12 U.S.C. § 84.
 
 
 22
 In the past, violations of the excess lending rule in 12 U.S.C. § 84 (1976) have been enforced through district court proceedings made possible by 12 U.S.C. § 93 (1976 & Supp. IV 1980). Section 93, which is derived from the National Bank Act of 1864, imposes liability on directors for knowingly violating or knowingly permitting violations of the banking laws. Here, however, the Comptroller, in an enforcement proceeding, is seeking to indemnify the Bank through the application of 12 U.S.C. § 1818(b)(1) (Supp. IV 1980).[6] Although in effect since 1950, section 1818(b)(1) was significantly amended in 1978 to extend the coverage of cease and desist orders, which had previously applied only to a bank, to include a bank's directors. On its face, § 1818(b)(1) requires no knowledge on the part of the wrongdoer. The provision simply allows the Comptroller "to take affirmative action to correct the conditions resulting from any such violation or practice."
 
 
 23
 Defendants argue, however, that 12 U.S.C. § 1818(b) imports the scienter requirement of § 93 when the Comptroller seeks to impose personal liability on bank directors for exceeding bank lending limits. We need not and do not resolve that question today. Even if the "knowingly" standard of 12 U.S.C. § 93 applies to an 1818(b) enforcement proceeding, we agree with the Comptroller that defendants are liable here.
 
 
 24
 The Supreme Court has enunciated the scienter requirement of § 93:
 
 
 25
 Under the rule settled by familiar decisions of this court, in order for the Bank to prevail in this action it must appear not only that the liabilities of a person, company, firms, etc., to the Bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans not through mere negligence but knowingly and in effect intentionally ... with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as "in effect intentional," ....
 
 
 26
 Corsicana National Bank v. Johnson, 251 U.S. 68, 71-72, 40 S.Ct. 82, 84, 64 L.Ed. 141 (1919) (citations omitted).
 
 
 27
 The Directors had knowledge of the identity of the borrowers, knowledge that all the loan proceeds were to be used by one company, and knowledge of the loan amounts and the bank's loan limits. The defendants have maintained that, because the loans were made on separate occasions, they failed to aggregate the loans. However, 12 U.S.C. § 84 requires the aggregation of loans to a single entity. Directors of a national bank operate in an area closely regulated by federal law, and cannot maintain ignorance of the law as a defense.[7] Cf. United States v. Corbin Farm Service, 444 F.Supp. 510, 519 (E.D.Cal.), aff'd, 578 F.2d 259 (9th Cir. 1978) (word "knowingly" in penalty section of federal pesticides act refers to awareness of facts, not awareness of law).
 
 
 28
 Since the scienter requirement of § 93 has been satisfied, whatever requirement § 1818(b) may have imported from § 93 has also been satisfied.
 
 
 29
 B. The Comptroller Can Properly Require that the Directors' Potential Liability of $350,000 Not Be Reduced by Recoveries Until the Legal Loan to Lewis has been Repaid with Interest.
 
 
 30
 The Directors' potential liability is limited to $350,000-the difference between the total credit extension to Fame ($575,000) and the amount of the legal Lewis loan ($225,000).[8] The Comptroller takes the position that the Directors' potential loss of $350,000 cannot be reduced by recoveries until the legal loan to Lewis has been repaid with interest.
 
 
 31
 In the instant case, the purpose underlying 12 U.S.C. § 84-protection of a bank's assets-will be furthered if the Directors are not allowed to extinguish their liability until the legal Lewis loan, which is unsecured, is fully repaid.[9] The policy of protecting bank assets would be frustrated if the Directors were allowed to make, as they did, an unsecured but legal loan to the borrower, then to use, or agree to the use of, the borrower's assets to secure further credit extensions that are illegal. Such a procedure would permit the Directors to protect themselves fully against any exposure resulting from the illegal loans while substantially increasing the risk that the bank would be unable to recover the amount of its legal loan. The fiduciary responsibility of the Directors of the bank precludes them from protecting themselves against liability at the bank's expense. The security arrangement was in derogation of that responsibility. Thus, the Directors may not use the borrower's assets to extinguish their own liability to the bank.
 
 
 32
 Here, the Directors ignored the recommendation of the Comptroller and the bank president's advice that the first loan to be paid off should be that of Rehbock Lewis and not Fame Furniture, since the stockholders might claim that this loan was paid to limit the liabilities of the Directors. The Comptroller's remedy is appropriate, because any other remedy could create a conflict of interest between the Bank and its Directors.
 
 
 33
 In light of the Comptroller's broad discretion to fashion an appropriate remedy, we conclude that the remedy he selected was lawful. It serves to protect the bank's assets, to insure that the Directors fulfill their fiduciary duty, and to prevent the Directors from insuring themselves against liability for their wrongful act at the Bank's expense.
 
 
 34
 C. The Remedy for Correcting Conditions Resulting from the Directors' Violation of Section 84 Properly Includes Collection Expenses on the Illegal Loans and Attorneys' Fees Paid by the Bank on Behalf of the Directors.
 
 
 35
 The Directors argue that the Comptroller is not authorized to award the Bank collection expenses and attorneys' fees paid by the Bank on behalf of the Directors. The Comptroller responds that he is authorized by 12 U.S.C. § 1818(b)(1) to take affirmative action to correct conditions resulting from the Directors' violation of the banking laws. Obviously the Comptroller has interpreted the Bank's collection expenses and attorneys' fees paid on behalf of the Directors as "conditions resulting" from the violation of 12 U.S.C. § 84.
 
 
 36
 The Directors argue that the collection expenses are not a condition resulting from the violation of the law: "There is no evidence that but for these loans being excessive they would not have become delinquent." That argument is meritless. If the Directors had acted within the law, the excess loans would never have been made, and the problem of collection would never have arisen.
 
 
 37
 The Directors also argue, relying on Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), that the Comptroller lacks authorization to grant attorneys' fees absent a specific congressional mandate to do so. Greene, however, dealt with the power of a district court to grant attorneys' fees to third-party intervenors who sued under the National Environmental Policy Act and demanded attorneys' fees. While the power of the court to grant attorneys' fees to private parties in a suit is carefully circumscribed, that situation is entirely different from the one at bar. In the instant case, the Bank is not a third-party intervenor and is not demanding attorneys' fees. It is the Comptroller who has ordered the award to make the Bank whole for losses resulting from the Directors' violation of the banking laws. Deference is due to the Comptroller's interpretation of the law under which he operates, and he has interpreted "affirmative action to correct conditions resulting" from the Directors' violation of 12 U.S.C. § 84 to cover an award of attorneys' fees.
 
 CONCLUSION
 
 38
 The Comptroller's decision and final order to cease and desist are affirmed. Substantial evidence supported the Comptroller's finding that the three loans could be aggregated as loans to a single business. Furthermore, the Comptroller, in fashioning a remedy, acted within the scope of his authority to correct conditions resulting from the Directors' violation of the banking laws.
 
 
 
 *
 Pursuant to Fed.R.App.P. 43(c), C. T. Conover is substituted for Charles E. Lord as Comptroller of the Currency
 
 
 [1]
 12 U.S.C. § 84 provides in pertinent part:
 The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund.
 
 
 [2]
 The amount of the bank's legal lending limit is not an issue in this case
 Dated Lending Excess
Granted Borrower Amount Limit Amount
------- -------- ------- ------- -------
1/19/79 Lewis 225,000
5/9/79 Fame 225,000
 -------
 Subtotal 450,000 272,866 177,134
6/11/79 Ware 125,000
 -------
 Present Balance 575,000 277,108 297,892
 -------
 
 
 [3]
 The Comptroller calculated the Directors' actual liability to the Bank as follows: the Bank had at the time of the hearing collected a total of $332,292 on the total $575,000 line of credit extended for the benefit of Fame. Therefore, for the sole purpose of calculating director liability the Comptroller applied these recoveries first to the reduction of the $225,000 legal loan to Rehbock Lewis. This left $107,292 to be applied to the reduction of the Directors' potential $350,000 liability on the two illegal Fame-related loans. Thus the Comptroller determined that the Directors were liable to the Bank in the principal amount of $242,708. The Comptroller also found that the Directors were liable for interest lost by the Bank on the two illegal loans in the amount of $71,598.56. Consequently, the Comptroller calculated the Directors' actual total liability to the Bank to be equal to $314,306. The Comptroller also held that once the Directors have indemnified the Bank for this amount, the Directors and not the Bank are to receive the benefit of any additional recoveries made on the Fame-related loans. In order to effectuate this result, Article III of the Comptroller's order to cease and desist requires the Bank to transfer all remaining interest or rights that it may have in the Fame-related loans to the Directors after such time as the Directors have complied with Article II's indemnification requirement
 
 
 [4]
 The statutory grant of authority that allows the Comptroller to issue an order to cease and desist from a violation or practice states in part:
 Such order may, by provisions which may be mandatory or otherwise, require the bank or its directors, officers, employees, agents, and other persons participating in the conduct of the affairs of such bank to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.
 12 U.S.C. § 1818(b)(1).
 
 
 [5]
 The provisions of Article II are summarized: (1) The Directors, with some exceptions, must indemnify the Bank for lost principal and interest on the Fame and Ware loans; (2) The Directors must indemnify the Bank for attorneys' fees; (3) The Directors must indemnify the Bank for its efforts to collect the Fame and Ware loans
 
 
 [6]
 See note 4, supra
 
 
 [7]
 Indeed, defendants concede in their opening brief: "Appellants' (sic) are not claiming ignorance of the law as a defense."
 
 
 [8]
 The Directors argue that their liability should be reduced as the Fame and Ware loans are extinguished. The Ware loan has been extinguished by the sale of bonds held as collateral and the Fame loan has been reduced by the offset of Fame's checking account. The Comptroller concedes that, as to the relationship between the Bank and the borrower, collateral can be used to reduce only the loan to which the collateral was assigned. However, the Comptroller reasons that the legal principles governing offsets and the sale of collateral to pay off a loan need not apply to the relation between the Bank and its Directors in determining the Directors' liability
 
 
 [9]
 The initial Loan Credit Report stated that the Lewis loan was to be secured "from receivables of Co. and/or sale of bonds." The bonds were actually used, however, to secure the illegal Ware loan rather than the legal Lewis loan