**MILWAUKEE COUNTY, WISCONSIN, Petitioner,**

v.

**Raymond J. DONOVAN, Secretary of the United States Department of Labor, Respondent.**

No. 84–1067.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1984.

Decided Aug. 6, 1985.*

As Amended Aug. 26, 1985.

Rehearing and Rehearing En Banc Denied Sept. 9, 1985.

---

\* On July 17, 1985, while a draft of this opinion was being circulated among all of the judges of this court in regular active service pursuant to Circuit Rule 16(e) because Section II had created a conflict with the decision of the United States Court of Appeals for the Third Circuit in *Lehigh Valley Manpower Program v. Donovan*, 718 F.2d 99 (3d Cir.1983), and that of the United States Court of Appeals for the Ninth Circuit in *City of Edmonds v. United States Department of Labor*, 749 F.2d 1419 (9th Cir.1984), the United States Court of Appeals for the Second Circuit issued its opinion in *St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37 (2d Cir.1985) (Friendly, J.), in which it held that the 120 day limitation of CETA § 106(b) was not jurisdictional. The Rule 16(e) submission was, therefore, withdrawn.

Charles D. Clausen, Friebert, Finerty & St. John, Milwaukee, Wis., for petitioner.

Ellen L. Beard, Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., for respondent.

Before ESCHBACH and COFFEY, Circuit Judges, and GRANT, Senior District Judge.**

ESCHBACH, Circuit Judge.

This dispute arises out of the development and administration by Milwaukee County, Wisconsin ("County" or "Petitioner") of programs funded under the Comprehensive Employment and Training Act ("CETA" or "Act"), 29 U.S.C. §§ 801–999 (Supp. II 1978). The County petitions for review of an order of the Secretary of the United States Department of Labor ("Secretary") in which it was determined, *inter alia*, that (1) in 1977 and 1978, the County had substituted approximately $1.2 million in federal CETA funds for County funds in violation of CETA "maintenance of effort" requirements; (2) the County, because of a violation of CETA wage and benefit regulations, was required to perform a record review and provide backpay and benefits to former participants; (3) costs associated with 17 ineligible CETA participants would be disallowed; and (4) a former County employee was entitled to backpay for wrongful discharge. In addition, the County now argues that the Secretary was barred from ordering relief because he failed to observe the statutory time limits

for the processing of claims against CETA grantees. For the reasons stated below, we grant in part and deny in part the petition for review.

## I. Procedural History

This action arose from the consolidation of a series of complaints filed with the United States Department of Labor ("DOL"). The first written complaint was received by the DOL in February 1978. A second letter of complaint, containing 57 issues and signed by 22 persons, was received in May 1978. Most of the matters raised in the initial complaint were alleged in more detail in the second complaint. A third complaint in December 1979 added 16 new allegations. Two additional and independent complaints were filed in May 1978 and January 1980. These five complaints were subsequently consolidated with other individual complaints.

The Grant Officer issued his initial determination on May 29, 1979. In response to a hearing request from the representative of one of the parties filed on December 11, 1979, the Office of the Administrative Law Judges ordered the Grant Officer to provide his final determination by December 30; the final determination was in fact issued on January 4, 1980.

Hearings before the ALJ began on August 4, 1980, and were concluded on March 13, 1981, with the ALJ issuing his decision on December 5, 1983. This petition for review followed.[1]

** The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, sitting by designation.

1. The statutory source of our jurisdiction is 29 U.S.C. § 817(a) (Supp. II 1978). The decision of the ALJ became the final decision of the Secretary under 20 C.F.R. § 676.91(f) (1983).

CETA was originally enacted in 1973 as Pub.L. No. 93–203, 87 Stat. 839, amended in 1974 by Pub.L. No. 93–567, 88 Stat. 1845, in 1976 by Pub.L. No. 94–444, 90 Stat. 1476, and in 1977 by Pub.L. No. 95–93, 91 Stat. 627, and substantially revised in 1978 by Pub.L. No. 95–524, 92 Stat. 1909. The Act was repealed, effective October 13, 1982, by § 184 of the Job Training Partnership Act ("JTPA"), Pub.L. No. 97–300, 96 Stat. 1322, 1357 (1982). However, JTPA

§ 181(e), 96 Stat. 1355, 29 U.S.C. § 1591(e), provides that the new legislation "shall not affect administrative or judicial proceedings pending on [October 13, 1982], or begun between [October 13, 1982,] and September 30, 1984, under [CETA]."

Because the events that gave rise to this petition for review occurred before the effective date of the 1978 CETA amendments, the substantive provisions of the 1973 version of the Act, as amended prior to 1978, govern the resolution of this case. Unless otherwise noted, however, the procedural and remedial aspects of this action are controlled by the Act as amended in 1978.

## II. Jurisdiction

Before considering the merits of the Secretary's order, we address the threshold argument presented by Petitioner that, because the "final determination" of the Grant Officer was not issued within 120 days of the receipt of the initial complaint, the Secretary was divested of jurisdiction under § 106(b) of the Act, 29 U.S.C. § 816(b) (Supp. II 1978), and, therefore, was "barred from recovering against the petitioner." After a thorough examination of the language of § 106(b), its legislative history, and the general purpose behind the 1978 amendments to the Act, we conclude that the 120-day limit of § 106(b) is not jurisdictional and, therefore, that the Secretary had the authority to proceed against Petitioner.[2]

■ We would initially note the well-established canon of construction that a single provision will not be interpreted so as to defeat the general purpose that animates and informs a particular legislative scheme. *See Bob Jones University v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025–26, 76 L.Ed.2d 157 (1983); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940). We, of course, do not substitute our judgment for that of Congress, but merely attribute to that legislative body a general overriding intent to avoid results that would undermine or vitiate the purposes of specific provisions. *Cf. Sorrells v. United States,* 287 U.S. 435, 447, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932).

■ In addition, it is beyond dispute that the 1978 amendments to the Act were "remedial" in nature, in that they were intended to give the Secretary greater power to prevent and correct the fraud and abuse that had developed in CETA programs. *See* S.Rep. No. 891, 95th Cong., 2d Sess. 42–43 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4480, 4522–23; H.R.Rep. No. 1124, 95th Cong., 2d Sess. 3, 5–6, 13 (1978); 124 Cong.Rec. 27,789 (remarks of Sen. Bellmon), 27,223 (remarks of Sen. Nelson), 25,183 (remarks of Rep. Myers), 25,-182 (remarks of Rep. Lehman), 25,168 (remarks of Rep. Hawkins) (1978); *see also* 18 U.S.C. § 665; 29 U.S.C. §§ 816(d)(1), (e), (f), 825(g), 836 (Supp. II 1978). We acknowledge, of course, that the term "remedial" does not have talismanic significance in the construction of legislation. *Cf. Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983). It does, however, affect the presumptions to be employed. With reference to the 1978 CETA amendments, we must in doubtful situations indulge in a presumption in favor of the Secretary's jurisdiction and will construe the Act accordingly.

Section 106(b) provides in relevant part:

**Investigation Of Complaints By Secretary**

Whenever the Secretary receives a complaint from any interested person or organization ... which alleges, or whenever the Secretary has reason to believe ... that a recipient of financial assistance under this chapter is failing to comply with the requirements of this chapter, the regulations under this chapter or the terms of the comprehensive employment and training plan, the Secretary shall investigate the matter. The Secre-

---

**2.** In the context of this opinion, the term "jurisdictional" refers to a statutory requirement that, if not complied with by the agency, would divest that agency of all power to act on the matter and that would not allow for any consideration of, for example, equitable exceptions or prejudice to the litigants. A parallel in federal litigation would be a requirement (such as diversity) necessary to the district court's subject-matter jurisdiction.

The term "mandatory" refers to a statutory requirement that the agency should attempt to comply with as a matter of course; however,

the failure to comply does not automatically divest the agency of power to act, but may provide the litigants with, for example, the right to compel the agency to act. *Cf.* 5 U.S.C. § 706.

The term "directory" refers to a statutory provision that is hortatory only and thus confers no right on the litigants to compel agency action.

Under the facts of this case, we need only determine whether § 106(b) is "jurisdictional" and, therefore, we express no opinion on the question whether this provision is either "mandatory" or "directory."

tary shall conduct such investigation, and make the final determination required by the following sentence regarding the truth of the allegation or belief involved, not later than 120 days after receiving the complaint. If, after such investigation, the Secretary determines that there is substantial evidence to support such allegation or belief that such a recipient is failing to comply with such requirements, the Secretary shall, after due notice and opportunity for a hearing to such recipient, determine whether such allegation or belief is true.

It should be noted that § 106(b), when read as a whole, is opaquely written and that the second sentence of the provision, when considered in isolation, seems to require a "final determination" within 120 days of the receipt of the complaint. It should also be noted that § 106(b) does not expressly address the situation presented in the instant case, i.e., the timing requirements for the final determination after the consolidation of numerous related complaints.

The second sentence did not in fact appear in the original bill, but was proposed by Congressman Obey and added as an amendment during the floor debates on the 1978 amendments to the Act. 124 Cong. Rec. 25,230–31 (1978). The Obey amendment actually contained two separate provisions. The first required that the prime sponsor reach a decision on a grievance within 60 days after the filing of the grievance; the second was the 120-day provision at issue in the instant dispute. After the reading of the amendments, the following colloquy occurred:

Mr. OBEY. Mr. Chairman, I understand this amendment will be accepted by the committee. It is a very simple amendment. All it does is put a specific period of time in the bill during which the prime sponsor must answer a complaint lodged against it for violations of

the conditions under which the CETA program exists in the first place, and also it establishes a 120-day time limit on the time during which the Labor Department can consider a complaint before it has to proceed.

. . . .

Mr. HAWKINS [sponsor of original bill]. Mr. Chairman, we have seen the amendment. We accept the amendment.

If [Mr. OBEY] would further yield, do I understand from [him] that if the determination is not made in a specified time it shall not affect the Secretary's jurisdiction in the matter?

Mr. OBEY. That is correct.

Mr. HAWKINS. With that understanding we do accept the amendment. *Id.*

Thus, it is clear from this exchange that the author of the 120-day provision and the sponsor of the original bill did not consider it jurisdictional in any way. Of course, these statements are not controlling; nevertheless, we find them highly persuasive. They were made by the author of the amendment and the sponsor of the original bill on the floor of the House during debates on the bill. In addition, no contrary view of the jurisdictional effect of the amendment was expressed, no objection was voiced, and nothing in the record indicates that Congress may have had an intent different from that expressed in this exchange.

We also find further support for our position in the general purposes of the 1978 amendments to the Act.[3] To ensure that CETA funds would not be diverted from their intended purposes, Congress sought to grant the Secretary "maximum authority to protect the integrity of the program." S.Rep. No. 891, *supra*, at 21, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 4480, 4501. It is also evident that Congress was aware that the DOL commanded insuffi-

---

**3.** The congressional reports that refer specifically to the 120-day limit of the 1978 amendments are unilluminating, as they merely track the language of § 106(b) and offer no elaboration. *See* S.Rep. No. 891, 95th Cong., 2d Sess. 43, 80

(1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 4480, 4523, 4560; H.R.Conf.Rep. No. 1765, 95th Cong., 2d Sess. 123 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4581, 4588.

cient resources to handle CETA investigations and that there was a backlog in the Department. *See id.* at 42, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 4522; H.R.Rep. No. 1124, 95th Cong., 2d Sess. 3, 5–6, 13; *see also* 124 Cong.Rec. 31,021 (1978) (remarks of Rep. Maguire); *id.* at 31,026 (remarks of Rep. Collins). Thus, it would indeed be incongruous to conclude that Congress would have the Secretary divested of jurisdiction under § 106(b) when he does not render his final determination within four months of the receipt of the complaint. *Cf. Occidental Life Insurance Co. v. EEOC,* 432 U.S. 355, 369–71, 97 S.Ct. 2447, 2456–57, 53 L.Ed.2d 402 (1977). In addition, such an interpretation would, in effect, give the DOL the power of "pocket dismissal" (analogous to the President's "pocket veto"), a power entirely inconsistent with the duty to ferret out fraud and abuse in the CETA system. Furthermore, the argument for a jurisdictional bar is weakened by the fact that the Act does not specify the consequences of the Secretary's failure to comply with the 120-day limit. *See Thomas v. Barry,* 729 F.2d 1469, 1470 n. 5 (D.C.Cir.1984); *Usery v. Whitin Machine Works, Inc.,* 554 F.2d 498, 501 (1st Cir.1977); *Tri-State Bancorporation, Inc. v. Board of Governors,* 524 F.2d 562, 565–66 (7th Cir.1975); *Fort Worth National Corp. v. Federal Savings & Loan Insurance Corp.,* 469 F.2d 47, 58 (5th Cir.1972); *cf. Zipes v. Trans World Airlines, Inc.,*

455 U.S. 385, 393–94, 102 S.Ct. 1127, 1132–33, 71 L.Ed.2d 234 (1982).

The instant case vividly illustrates why the 120-day limit cannot be construed as jurisdictional. Counsel for Respondent informed this court at oral argument that this was the most elaborate and time-consuming CETA dispute to date. As noted above, the Grant Officer was confronted with over seventy separate "counts" derived from a series of complaints that were filed over an approximately two-year period. Of course, the proceedings before the ALJ are not included in the 120-day period.[4] We will refer to them, however, as they illustrate the complexity of this dispute. Petitioner described the hearing before the ALJ as follows: "This case, as presented to the ALJ, involved a great number of issues. Thirty-nine days were spent in evidentiary hearings, approximately 9,000 pages of transcript were generated, and hundreds of exhibits were offered and received." Petitioner's Brief at 4. The ALJ described the allegations presented as an "almost unmanageable conglomerate mass." *See also* Petitioner's Appendix at 68–69 (ALJ's discussion of complexity of dispute and reasons for Grant Officer's delay). His final order covered eighty single-spaced typewritten pages. The requirement of a final determination from the Grant Officer in 120 days under these facts would be a practical impossibility at best,

---

**4.** It should be noted that, under CETA § 106(b) and 20 C.F.R. § 676.86 (1984), the 120-day period begins to run from the date the Grant Officer receives a complaint filed after the exhaustion by the complainant of local administrative remedies. This initial complaint, of course, may be amended, clarified, or amplified at any time during the proceedings and such modifications relate back to the original filing date, 20 C.F.R. § 676.86(b)(7). The Grant Officer must first investigate the complaint and then issue an "Initial Determination" that there is or is not sufficient evidence to support the allegations of the complaint, *id.* § 676.86(c), § 676.88(a), (b); *see also id.* § 676.86(d)–(h). In this case, for example, the Grant Officer was obliged to conduct a lengthy investigation, which included interviews with approximately 67 individuals.

An opportunity for an informal resolution must then be provided, *id.* § 676.88(d). If the parties cannot resolve the dispute, the Officer

must then issue a "Final Determination," which shall (1) indicate the efforts undertaken to resolve informally the matters contained in the initial determination, (2) list those matters upon which the parties continue to disagree, (3) list any sanctions and required corrective actions, and (4) inform the parties of their opportunity to request a hearing before an ALJ, *id.* § 676.88(e). It is this document that constitutes the "final determination" required within 120 days under § 106(b). *See* 20 C.F.R. § 676.86(a)(1); *cf. id.* § 676.86(a)(2). Thus, the final-determination process "consists of the non-criminal investigation, the determination of substantial evidence (either supporting or not supporting the allegations of the complaint ...), and the procedures regarding notice, informal resolution or lack of informal resolution, and notice of opportunity for hearing," *id.* § 676.86(a)(1), under the Act, but does not include subsequent proceedings before the ALJ.

and the effect of such a construction would be to remove completely disputes of this kind from the Secretary's jurisdiction and to extinguish absolutely the claims of innocent complainants, even though they were in no way untimely or at fault in initiating the action.

Thus, we conclude that the 120-day limit is not jurisdictional, for such a construction would be inconsistent with the purpose of the 1978 amendments and would frustrate the intent of Congress to accord the Secretary "maximum authority" to control abuse and fraud in CETA programs. In addition, we believe that the 120-day limit was intended to benefit claimants by ensuring that their claims would be resolved expeditiously. If jurisdictional, the limit would impose a paradoxical hardship on claimants by destroying their claims if the Secretary does *not* act expeditiously. In effect, timely claims would be defeated by the Secretary's failure or inability to process those claims. Our conclusion is not only supported by the specific circumstances of the 1978 CETA amendments, but also by the general rule that agency action should not be set aside for delay, *see, e.g., NLRB v. International Association of Bridge, Structural & Ornamental Ironworkers,* 466 U.S. 720, 104 S.Ct. 2081, 80 L.Ed.2d 715 (1984) (Administrative Procedure Act and National Labor Relations Act); *NLRB v. J.H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 263–66 & n. 3, 90 S.Ct. 417, 420–21 & n. 3, 24 L.Ed.2d 405 (1969) (same); *Garvey Grain Co. v. Director,* 639 F.2d 366, 368 n. 3, 372 (7th Cir.1981) (Longshoremen's and Harbor Workers' Compensation Act); *Ralpho v. Bell,* 569 F.2d 607, 626–28 (D.C.Cir. 1977) (Micronesian Claims Act of 1971); *Usery v. Whitin Machine Works, Inc.,* 554 F.2d 498, 501–03 (1st Cir.1977) (Trade Act of 1977); *see also Chromcraft Corp. v. EEOC,* 465 F.2d 745 (5th Cir.1972) (Administrative Procedure Act); *cf. Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *In re Grand Jury Proceedings,* 757 F.2d 108, 110–12 n. 1 (7th Cir.) (30-day limit of 28

U.S.C. § 1826(b) not jurisdictional), *cert. denied,* —— U.S. ——, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985), as the contrary rule would place the adverse consequences on the specific beneficiaries of the legislation and on federal taxpayers generally and would allow the alleged wrongdoer to escape liability merely because of a procedural default on the part of the agency.

We note that the Court of Appeals for the Third Circuit, in *Lehigh Valley Manpower Program v. Donovan,* 718 F.2d 99 (3d Cir.1983), has considered the effect of the Grant Officer's failure to comply with the 120-day limit of § 106(b). Although it did not expressly denominate § 106(b) as "jurisdictional," the Third Circuit did hold that the Grant Officer's failure to comply with that provision divested the Secretary of all power to act and that the question of prejudice to the litigants was irrelevant. The Secretary's order was then set aside. Thus, in the context of this discussion, *see supra* note 2, the court in *Lehigh* construed § 106(b) as "jurisdictional." Given our own independent analysis of the question, we decline to follow the *Lehigh* decision.

The Third Circuit examined the language of § 106(b), but did not consider its legislative history or the general purpose of the 1978 amendments, even though the court acknowledged that the "[i]nsertion of the Obey amendment ... result[ed] in a somewhat garbled provision." 718 F.2d at 101. In addition, the court placed great weight on the DOL's incorporation of the 120-day limit into the CETA regulations. *See, e.g.,* 20 C.F.R. §§ 676.86(a)(1), (c), 676.88(e) (1983). The agency, according to the Third Circuit, was bound by its own procedural rules. This is, of course, usually the case, but the threshold question, which the court in *Lehigh* did not exhaustively examine, is whether the regulations were consistent with their statutory source, as it is the enabling legislation that determines the scope of any corresponding regulatory provision.[5]

---

**5.** As indicated in the text, after our own independent analysis, we have concluded that

More recently, the Court of Appeals for the Ninth Circuit, in *City of Edmonds v. United States Department of Labor,* 749 F.2d 1419 (9th Cir.1984), has expressly held that § 106(b) is jurisdictional. *See also Pierce County v. United States,* 759 F.2d 1398 (9th Cir.1985). For the most part, the court in *Edmonds* simply adopted the reasoning of the *Lehigh* decision. In addition, the court in *Edmonds,* focusing on the use of the word "shall" in § 106(b), concluded that this term was generally "mandatory" and stated that there was no reason to depart from this interpretation.

The court relied in part in reaching its conclusion on the Supreme Court's decision in *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), which construed the use of the term "shall" in 49 U.S.C. § 2000e-5(c) and (e) to impose a mandatory requirement of filing a charge with the EEOC within the statutory time limits. We, of course, can distinguish *Mohasco* on the ground that § 2000e-5(e) deals with the filing of a charge by an aggrieved employee, which does not correspond to the situation presented by CETA § 106(b), where the claimants have filed a timely claim and only the decisionmaker is responsible for the delay. However, cases subsequent to *Mohasco* provide a definitive response to the *Edmonds* decision. It is true that the Court in *Mohasco* found the filing requirement to be mandatory. It does not follow, however, that all "mandatory" requirements are "jurisdictional." The *Mohasco* decision itself is ambiguous on the jurisdictional question. *Compare* 447 U.S. at 811–12, 100 S.Ct. at 2490 *with id.* at 811 n. 9, 100 S.Ct. at 2490 n. 9. Any questions concerning the character of § 2000e-5(e), however, were unequivocally dispelled in *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), in which the Supreme Court held that "filing a timely

charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." The Court did not simply rely on the use of the term "shall," but considered the specific context in which it appeared and concluded that the imposition of a jurisdictional requirement would be inconsistent with the legislative history and the remedial purposes of Title VII.

The *Zipes* decision aptly illustrates that no universal legislative lexicon has yet been developed and that the courts, therefore, must consider each provision against the background of its enactment. *Cf. Wirtz v. Local 153, Glass Bottle Blowers Ass'n,* 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968). The legislature's use of terms such as "shall" and "must," rather than "may," does not automatically require that the provision be construed as mandatory, much less jurisdictional. A variety of factors must be considered, including whether such a construction would produce an absurd or unnecessarily harsh result. *See Bartholomew v. United States,* 740 F.2d 526, 531 (7th Cir.1984); *Ralpho v. Bell,* 569 F.2d 607, 626–28 (D.C.Cir.1977); *see also Walsh v. United States,* 723 F.2d 570, 573–74 (7th Cir.1983) ("may" construed as mandatory); *Thompson v. Clifford,* 408 F.2d 154, 158–60 (D.C.Cir.1968) (same). In the context of § 106(b), such an interpretation would lead to "absurd" and "harsh" results, in the sense that it would undermine the general purpose of the 1978 CETA amendments described above and the evident purpose of the 120-day limit itself.

In conclusion, the Grant Officer's failure to comply with the 120-day deadline of § 106(b) did not divest the DOL of jurisdiction over this dispute. We will now consider the merits of the Secretary's decision.

§ 106(b) is not jurisdictional. If 20 C.F.R. §§ 676.86 and 676.88 could only be read as imposing a jurisdictional requirement, we would also find that they contravene § 106(b) and were, therefore, invalid. However, as these regulations merely follow the language of the statute, they must be construed as imposing a time limit that is no more onerous than that of § 106(b) itself. Thus, the Grant Officer's failure to comply with the DOL's regulations did not divest the Secretary of jurisdiction.

## III. "Maintenance of Effort" Violations [6]

As authorized by state law, the County has, since the 1930's, maintained some form of work relief for general-assistance recipients. *See* Wis.Stat. § 49.002. During the 1970's, this program was known as the Pay for Work Program ("PFWP") and, prior to 1977, it provided 550 to 750 minimum-wage positions, primarily within the county government, for individuals who would otherwise be receiving cash welfare grants. Both the general-assistance program and the PFWP programs were funded by County revenues.

During the period under consideration, Petitioner made the following expenditures for PFWP:

| YEAR | EXPENDITURE |
|------|-------------|
| 1975 | $2,335,996 |
| 1976 | $3,014,580 |
| 1977 | $2,097,428 |
| 1978 | $ 333,277 |

Petitioner also made the following expenditures on general-assistance grants:

| YEAR | EXPENDITURE |
|------|-------------|
| 1976 | $8,705,256 |
| 1977 | $8,818,328 |

Petitioner had originally budgeted for 1977 over $4.2 million for PFWP in order to expand the program to 1200 positions. This goal, however, was never achieved. The initial budget for general assistance for the same year of $3.1 million was substantially less than the amount actually spent in 1976. The ALJ in fact found that the 1977 budget had been set at an "unrealistically low" level. In early 1977, it be-

came apparent that the original budget for the general-assistance program was inadequate. The County transferred during the latter half of 1977 $2.2 million from PFWP and $1.25 million from the County contingency fund to general assistance and ultimately spent $8.8 million for general assistance. By the middle of 1977, however, PFWP had approximately 682 participants and a "backlog" of 2,000 individuals who were eligible for the program, but for whom positions were not available.

During the first half of 1977, the County began planning for a new CETA program that would provide training and work experience to individuals eligible for general assistance, *i.e.*, the same class of individuals served by PFWP. The result was the creation of two new CETA programs. The first, Learn-to-Earn ("LTE"), which began in June 1977, was a training program in job-search skills and was funded under Title I of the Act. The original budget for LTE was $1,022,311 for the period from June 7, 1977, to December 31, 1977. The second, Handicapped Serving the Handicapped ("HSH"), provided work-experience and public-service employment positions in sheltered workshops and was funded under Title VI of the Act. The original budget for HSH was $2,409,624 for the period from July 1, 1977, to June 30, 1978. By the end of 1977, 571 general-assistance eligibles were enrolled in the work-experience segment of HSH.

In early 1978, LTE and HSH were combined and renamed the Work Assistance Program ("WAP"). Additional funding

---

**6.** Pursuant to Fed.R.App.P. 17(b), the DOL filed a certified list with this court in lieu of the administrative record. Although the party seeking review is ordinarily responsible for assembling the record, *Trotter v. Klincar*, 748 F.2d 1177, 1184 n. 8 (7th Cir.1984), Rule 17(b) represents a departure from this allocation of responsibility, *see* J. Moore, B. Ward & J. Lucas, 9 Moore's Federal Practice ¶¶ 217.02[1], [3] (2d ed. 1982).

We acknowledge the value of Rule 17(b) in that it allows parties seeking review of agency action to forgo the expense associated with filing and transcribing the complete administrative record when an examination of the entire record may not be necessary. Nonetheless, al-

though technically permissible, the filing of a certified list may be inappropriate, especially if the Petitioner challenges the evidentiary basis of the agency's rulings. If the Petitioner is relying on some portion of the record, it should at least provide it in an appendix to the court.

In any event, the County does not, for the most part, dispute the Secretary's findings of fact, but rather the application of the relevant legal rules to those facts. To the extent that the County disagrees with the Secretary's findings, we have determined that these facts are not material to the resolution of this dispute. Thus, we have proceeded to consider the Secretary's order on the basis of the briefs and appendices filed with this court.

was obtained under Titles II (public service employment) and III (youth employment) of the Act, and from the County. WAP, like its predecessors LTE and HSH, was to benefit the general-assistance population.

Although it is not essential to the resolution of this dispute, there are indications that, during the second half of 1977, participation in PFWP began to decline and that the County apparently reduced its referrals to PFWP and began to refer eligible general-assistance applicants to the CETA programs. Thus, it would appear that, in January 1978, when the County transferred PFWP to the CETA Work Assistance Program, the number of participants in the County-funded program was below 682.

The Grant Officer found that, because PFWP was discontinued in January of 1978, the County's expenditures in 1977 should be used as the benchmark in determining whether a violation of the CETA maintenance-of-effort provisions had occurred. Thus, since the total amount of non-federal funds expended for work-experience positions for general-assistance eligibles in 1978 was greater than the corresponding amounts for 1977, the Grant Officer found no violation.

The Secretary reversed this portion of the Final Determination. He first rejected the Grant Officer's reasoning as too superficial, because it did not account for the fact that CETA funds were initially expended in 1977. After finding that WAP was the functional replacement for PFWP, in that both programs provided work-experience positions for the general-assistance population in lieu of cash grants, the Secretary concluded that this replacement began in 1977, when CETA funds were first used for the LTE and HSH programs. He also found that:

> The record leaves absolutely no doubt that the major purpose of the WAP was

to save County tax levy dollars previously spent on both General Assistance and the PFWP by creating a new employment and training program for General Assistance eligibles to be supported by Federal CETA dollars.

The Secretary concluded that Petitioner had violated the maintenance of effort provisions in that it failed to maintain its funding in 1977 and 1978 (when these CETA programs were first implemented) at the 1976 level and that the substitution of CETA funds resulted in the substitution of federal for non-federal funds "in connection with work that would otherwise be performed." The year 1976 was chosen as the base year for comparison, because this was the most recent year during which no CETA money was expended for work-experience positions for the general-assistance population. Thus, the extent of the substitution was determined in the following manner:

| YEAR | NON-FEDERAL EXPENDITURES | "SHORTFALL" |
|------|--------------------------|-------------|
| 1976 ........ | $3,014,580 | N/A |
| 1977 ........ | $2,097,428 | $ 917,152 |
| 1978 ........ | $2,732,487 | $ 282,093 |
| | TOTAL: | $1,199,245 |

The County was, therefore, ordered to pay $1,199,245 in disallowed costs to the DOL.

CETA contains a number of "maintenance of effort" provisions designed, in general, to require CETA grantees to use CETA funds to create *new* employment and training opportunities, to guard against the displacement of current civil-service employees, and to ensure that federal grants are not substituted for local funding of the same jobs or public services.[7] Certain provisions prohibit "the substitution of Federal for other funds in connection with work that would otherwise be performed." [8] Section 605(b) of the Act [9]

---

7. *See generally* CETA § 205c)(8), (25), 29 U.S.C. § 845(c)(8), (25) (1976); CETA § 208(a)(1), 29 U.S.C. § 848(a)(1) (1976); CETA § 353(a), (b)(1)–(6), 29 U.S.C. § 895b(a), (b)(1)–(6) (Supp. I 1977); CETA § 602(c), 29 U.S.C. § 962(c) (1976); CETA § 605(b), 29 U.S.C. § 965(b) (1976); CETA § 703(7), (11), 29 U.S.C. § 983(7), (11) (1976); *see also* 29 C.F.R. §§ 96.24,. 97.334, 97.719, 99.34 (1978).

8. *See, e.g.,* CETA § 208(a)(1)(C), 29 U.S.C. § 848(a)(1)(C) (1976); CETA § 353(b)(3), 29 U.S.C. § 895b(b)(3) (Supp. I 1977); CETA § 602(c), 29 U.S.C. § 962(c)(1976); CETA § 703(7), 29 U.S.C. § 983(7) (1976); *see also* 29

states that "[n]o funds for public service employment programs under this chapter may be used to provide public services, through a private or nonprofit organization or institution, which are customarily provided by a State, a political subdivision, or a local educational agency in the area served by the project." Other provisions prohibit the substitution of federal for non-federal funds.[10]

■ The County does not dispute the factual findings of the Secretary, and its attack is a narrow one that is limited to the finding that the use of CETA funds resulted in the substitution of federal for non-federal funds "in connection with work that would otherwise be performed." Petitioner argues that the Secretary misconstrued the maintenance-of-effort provisions. The County's position is, in essence, that there was no "work that would otherwise be performed" that was affected by Petitioner's expenditure of CETA funds in 1977. Petitioner claims that no PFWP participant was transferred out of that program in 1977; it does concede, however, that "certain CETA-eligible welfare recipients on the '[PFWP] backlog' were enrolled in the CETA-funded [LTE] and [HSH] programs." Petitioner maintains, however, that, since these 1977 participants had not previously been working in a County-funded program, their enrollment in the CETA programs "cannot be viewed as substituting federal for other monies in connection with work that would otherwise be performed."

Petitioner's position represents a misreading of the maintenance-of-effort provisions and their implementing regulations, as well as a misunderstanding of their purpose. These statutes are phrased in the conditional, yet Petitioner would have them reach only work that "was being performed," not work that "would otherwise be performed." Congress intended that CETA funds supplement, not replace, non-

federal funding. *See Maine v. United States Department of Labor*, 669 F.2d 827 (1st Cir.1982). A requirement of a "maintenance" of effort is meaningless unless a benchmark is available to determine the appropriate level of the "effort." In addition, even Petitioner's own argument is an acknowledgement that the inquiry must focus, not on the number of individuals in a given program, but on the level of funding and that a "benchmark" must be initially established. The crucial issue, then, is whether 1976 or 1977 is the appropriate year for determining the level of the County's "effort." Thus, the question of whether there was participant "attrition" in PFWP during 1977 is, under these facts, of little moment, as it is the level of funding, not the number of participants, that is dispositive.

■ We agree with the Secretary's conclusion that, although Petitioner was entitled to use CETA funds to provide training and work experience for the general-assistance population, it was at the same time required to maintain its local funding for substantially equivalent County programs at the level of the most recent year in which no CETA money was expended for these purposes. Thus, 1976 provides the proper reference point. Had the County maintained its funding at the 1976 level, some portion of the work-experience positions and public services provided by LTE, HSH, and WAP would otherwise have been funded by non-federal money. Because the County did not, work and services were performed as a result of the substitution of federal funds for non-federal funds.

In its reply brief, Petitioner counters with the argument that its reduction of the 1977 PFWP budget was not due to the decrease in the number of participants or substitution of federal for non-federal funds, but to the fact that, after the Supreme Court's decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct.

C.F.R. § 99.34(b)(3) (1978); *cf.* CETA § 205(c)(25), 29 U.S.C. § 845(c)(25) (1976).

**9.** 29 U.S.C. § 965(b) (1976).

**10.** *See, e.g.,* CETA § 205(c)(25), 29 U.S.C. § 845(c)(25) (1976); CETA § 703(11), 29 U.S.C. § 983(11) (1976).

2465, 49 L.Ed.2d 245 (1976), *overruled,* *Garcia v. San Antonio Metropolitan Transit Authority,* —— U.S. ——, 105 S.Ct. 1005, 1021, 83 L.Ed.2d 1016 (1985), the County decided to reduce the PFWP employees' wages and hours below the minimum federal requirements. In 1976, the County paid $2.20 an hour for a 40–hour work week; in 1977, the County paid $2.00 an hour for a 32-hour work week. Thus, assuming that the same number of employees, *i.e.,* 682, was participating in PFWP in 1976 and 1977 and that those employees worked 52 weeks a year, the County was able to "save" $851,136 in 1977.[11]

■ We initially note that this figure represents only 93% of the "shortfall" found by the ALJ for 1977 and only 71% of the total deficiency for 1977 and 1978. Moreover, this second argument suffers from the same fundamental deficiency as the first, for the relevant question under the maintenance-of-effort provisions is not the number of positions, but the level of non-federal funding before and after the use of CETA funds. It is clear from the wording of these statutes that Petitioner cannot discharge its obligations under CETA by simply retaining the same number of employees at a reduced annual salary while using CETA funds to provide employment for similarly situated individuals. Following Petitioner's argument to its logical extension would mean that, if the *National League of Cities* decision had allowed the County to pay $1 a year to each PFWP participant, then the County would have discharged its obligations under CETA had it allocated only $682 of County funds to PFWP in 1977.

Quite to the contrary, we find that the *National League of Cities* argument further undercuts Petitioner's position: in view of the availability of CETA funds, the proper response to the wage-and-hour reduction after *National League of Cities* would have been the creation of more PFWP positions, especially in view of the backlog of eligible applicants in 1977. The County did in fact originally intend to expand PFWP in 1977 with a considerably larger budget, but subsequently reduced the program with substantial transfers from PFWP to the general-assistance program after it was known that CETA funds were available. The *National League of Cities* decision may justify the wages and hours of PFWP participants in 1977, but it does not explain why the original 1977 PFWP budget of $4.2 million was ultimately reduced to $2 million when approximately $2 million were spent in the CETA programs in 1977.

We have considered all of the remaining arguments raised by Petitioner in its challenge to the Secretary's finding of a violation of the maintenance-of-effort provisions and have found them to be without merit. In conclusion, we agree with the Secretary's finding that Petitioner did not meet its obligation under the maintenance-of-effort provisions of the Act and that the "shortfall" for 1977 and 1978 should be disallowed.

IV. Wage and Benefit Review

Regulations for CETA Titles I and VI that were in effect from the inception of the County's CETA programs in mid-1977 to April 1, 1979, provided that wages and benefits for work-experience participants were to be commensurate with such factors as the type of work performed, the skill proficiency of the participant, the geographic region of the program, and the prevailing wages and benefits for similarly employed employees. *See* 29 C.F.R. §§ 95.-33(d)(4)(viii), 96.34, 98.24(b), 99.37(e) (1978).[12] However, the base wage provided by the County for work-experience participants in WAP was set at the federal minimum wage.

---

11. As noted above, the record does not necessarily support the conclusion that 682 participants remained in the PFWP throughout 1977. We will assume for the sake of argument that this level was maintained.

12. 20 C.F.R. § 676.26–1(b) (1984), which became effective on April 1, 1979, *see* 44 Fed.Reg. 19,990, 20,014 (1979), allowed the payment of the minimum wage to almost all work-experience participants.

In his Initial and Final Determinations, the Grant Officer concluded that Petitioner had violated CETA regulations by paying only minimum wage and by not providing the proper benefits. The initial corrective action proposed was an order to the County to classify all work-experience positions in WAP by the factors enumerated in the applicable regulations, to determine the proper wages and benefits under the regulations, and to submit the results to the DOL's regional office for review. The Final Determination modified this remedy to require that the County first notify all former CETA participants, by newspaper notices and mailings, to submit claims if they believed they were underpaid. A representative of the employees could also submit specific documentation on individual participants. The claims would next be reviewed by an outside agency, which would then notify each participant of the results of the review and of the right to appeal to the Office of Administrative Law Judges. Costs for the record review, back wages, and benefits could be paid from CETA funds.

 The County did not appeal this portion of the Final Determination and has thereby conceded liability; the complainants, however, in the proceedings before the ALJ, did contest the corrective action ordered by the Grant Officer on the ground that the burden of determining the proper wages and benefits should be borne by the County, not by the individual CETA participants.

The ALJ found that the record lacked the type of detailed information needed to allow him to establish the proper wages and benefits for each of the approximately 5,400 individuals enrolled in the County's CETA programs between July 1, 1977, and April 1, 1979. He also concluded that the corrective action ordered in the Grant Officer's Initial Determination was more appropriate than that of the Final Determination. He found that a requirement of computation of the appropriate earnings prior to notification to former employees was necessary because this placed "the burden of

evaluating jobs and calculating wages on the prime sponsor, which could have avoided the problem by following the regulations in the first place, and which has better access to the necessary information than former participants." Thus, the ALJ ordered that the County classify all CETA work-experience positions according to the factors enumerated in the regulations, determine the proper wages and benefits, and submit the results to the regional DOL office for review within 60 days of the date of his decision. The DOL office would then have 30 days to review these submissions and the County would have 30 days thereafter to compensate all underpaid former CETA participants that could be located. If, due to changed circumstances, federal funds were not available for the back wages, the benefits, and the expenses associated with the record review, the County was required to defray these costs from its own funds. The Final Determination was affirmed in all other respects.

In its petition for review, the County contests the corrective action ordered and argues that the Secretary's requirement of a comprehensive wage review was an abuse of discretion and not in accordance with the applicable law. We concur in the Secretary's observation that the County, with superior access to the records and as the party at fault, should bear the costs of the record review. Furthermore, we recognize that, given the characteristics of the class of former CETA employees, it is unreasonable to assume that they will be able to recognize independently whether they are entitled to additional compensation.

Nonetheless, it is not obvious that the appropriate solution is to require Petitioner to complete the record review for *all* former participants when a substantial number of them will never be located. The former employees bear the burden of coming forward after they have received notice whether the record review is performed before or after the notification. However, undertaking the review before notification would require Petitioner to perform many costly calculations that will never be used,

when the goal of the record review is to provide the proper compensation to the former CETA participants at a reasonable cost to all parties involved. Thus, to the extent that the Secretary's order requires Petitioner to incur substantial expense in undertaking the wage review [13] prior to notification when it is almost certain that, despite reasonable efforts at notification, a considerable number of former CETA participants will never be located, we agree that the remedy constitutes an abuse of discretion. We conclude that notice should first be sent to the participants and that the record review should then be performed for those individuals who come forward. To that extent, we reinstate the corrective action set forth in the Grant Officer's Final Determination.

We note, however, that the Final Determination required that the County notify all CETA participants to submit claims *if they believed they were underpaid.* This places an inappropriate burden on the participants, as it calls for a threshold determination on their part that they are in fact entitled to additional compensation. Thus, the initial notice must simply instruct those individuals who participated in CETA programs during the relevant period to come forward; the records of the individuals who are located will then be analyzed by Petitioner. The Secretary should determine the proper form of notice to be sent to the former CETA employees and set the appropriate procedure and schedules for the subsequent record review and reimbursement.

We have considered all of the remaining arguments raised by Petitioner in its challenge to the record review and have found them to be without merit. In conclusion, this portion of the Secretary's order is remanded for action consistent with this opinion.

## V. Disallowed Costs under CETA Title VI

■ The Secretary found, and Petitioner does not dispute, that 17 WAP participants were originally enrolled under CETA Title VI following their transfer from PFWP in 1978 when they were in fact ineligible under that Title. The County, however, claimed that any initial misallocation was "cured" when the costs associated with these participants were subsequently "backed out" of Title VI and applied to Title I, under which the participants were eligible. The Secretary rejected this argument:

> [E]ligibility determinations should be made *before* a participant is enrolled in CETA and the key eligibility question is whether, at the time of application, a participant is eligible for the title in which he or she is then enrolled. See 29 CFR 99.42(a)(1). Adjustments of the type made here by the prime sponsor cannot retroactively create eligibility. Moreover, any attempt to do so would be contrary to the cost principles of Federal Management Circular 74–4 ..., codified at 41 CFR Subpart 1–15.7, incorporated by reference in the CETA regulations at 29 CFR 98.12(a). According to 41 CFR 1–15.703–2(b):
>
> > "Any cost allocable to a particular grant or cost objective under the principles provided for in this subpart may not be shifted to other Federal grant programs to overcome fund deficiencies, avoid restrictions imposed by law or grant agreements, or for other reasons."

(emphasis in original)

Thus, Petitioner was ordered to pay the DOL the amount of the disallowed costs for these 17 participants.

The County's argument is unpersuasive, and its cursory description of the proceedings below has not aided our review. In

---

**13.** At oral argument, the County represented to this court that the wage review cannot be accomplished solely by computer analysis *en masse* of the information the County now has at its disposal and that the determination requires an examination of the individual records for each former participant. We do not understand the Secretary to argue to the contrary. In fact, at oral argument, counsel for the DOL stated that the Secretary would not object if notice were provided prior to the record review.

addition, there are no citations to the record on the issue of cost allocation. We, therefore, have no information regarding the cryptic allusions to the subsequent "backing out" of the costs associated with these 17 individuals.

In any event, as we understand its contentions, the County, with no citation to authority, maintains that, although these individuals were initially improperly enrolled under Title VI when they were eligible under Title I, the "backout" of costs was "a bookkeeping or accounting practice used to cure a bona fide human error in participant enrollment, and not an evasive act designed 'to avoid restrictions imposed by law,'" so that the costs should not be disallowed. We disagree.

CETA Titles I and VI had different eligibility criteria. *Compare* 29 C.F.R. § 95.32 (1978) (Title I) *with id.* § 99.42 (1978) (Title VI). The requirements of Title VI were more stringent. For example, under 29 C.F.R. § 99.42(a)(1)(ii), the participant (1) must have been unemployed or receiving unemployment compensation for 15 out of the 20 weeks preceding his application and (2) must not have obtained permanent, unsubsidized, full-time employment during that 20-week period. We gather from the ALJ's decision that he relied on the employee-record evaluation described in the affidavit of Helen Humphrey, a "Manpower Development Specialist" for the DOL. With reference to the 17 individuals under consideration, Ms. Humphrey, because of the County's inadequate documentation, found that none of these participants met the requirement of 29 C.F.R. § 99.42(a)(1)(ii).

29 C.F.R. § 99.43(a) (1978) provides that "[p]rime sponsors shall be liable for any payments made to participants determined ineligible during program audits or reviews or otherwise." *See also* 29 C.F.R. §§ 96.-25, 99.42(c)(1) (1978). 29 C.F.R. § 99.43(b)

and (c) set out procedures that would allow prime sponsors to "protect their liability [sic]." *See also* 20 C.F.R. § 676.88(c) (1983). Petitioner has in no way indicated that it followed those procedures with reference to these 17 participants. Although disallowance of the costs may appear inflexible, the regulations discussed above set out the limited circumstances under which the County may escape liability. Otherwise, it bears the risk that the associated costs will be disallowed. The County is essentially arguing that it is "unfair" to impose this sanction. Although the regulations do not suggest that equitable exceptions are available, we need not decide this question, as the equities clearly do not weigh in the County's favor. We, therefore, affirm the ALJ's decision that the costs associated with these 17 individuals be disallowed.

## VI. Backpay Award to Cheryl Tucker

Ms. Tucker, a former PFWP staff member, was laid off on May 8, 1978, due to the termination of that program, and maintained no further communications with Petitioner. The Secretary noted that it was undisputed that Ms. Tucker was laid off due to the dissolution of the County-funded PFWP, which was replaced by the CETA-funded WAP, and thus concluded that the layoff was a displacement of a currently employed worker in violation of the maintenance-of-effort and anti-displacement provisions of the Act.[14] The County was ordered to take affirmative steps to locate Ms. Tucker, to offer her reinstatement to a comparable position, and to award her backpay plus interest from non-CETA funds; however, the County could offset against this award, upon proof submitted to the Grant Officer, any amounts of wages earned by Ms. Tucker or of general assistance paid to her by the County after her layoff.[15]

14. *See, e.g.,* CETA § 208(a)(1)(B), 29 U.S.C. § 848(a)(1)(B) (1976); § 353b(2), 29 U.S.C. § 895b(2) (Supp. I 1977); § 602(c), 29 U.S.C. § 962(c) (1976); § 703(7), 29 U.S.C. § 983(7) (1976); *see also* 29 C.F.R. § 99.34(b)(2) (1978).

15. The Secretary represented to this court at oral argument that Ms. Tucker has recently been in communication with the County, that she has been reinstated with the County, and that she is in the process of transmitting information to the County with regard to the income she had earned since her layoff. The Secretary

The County does not contest the finding of liability and apparently does not challenge the reinstatement order. It does maintain, however, that (1) the award of backpay should be remanded to the DOL due to the absence of findings on the extent of Ms. Tucker's injury and on her efforts to mitigate those damages and (2) the Secretary improperly limited the scope of offsetting payments for the backpay award. Once again, there is little reliance on relevant legal authority and *no* citation to the record in the County's brief.

■ Because Ms. Tucker was terminated without cause in violation of the maintenance-of-effort and anti-displacement provisions of the Act, there is no serious question that backpay was an appropriate remedy. *See City of Chicago v. United States Department of Labor,* 753 F.2d 606, 607–08 (7th Cir.1985). It is, of course, unreasonable under these circumstances to require that the Secretary set an exact amount on the backpay award, as this liability continues to accrue until reinstatement. In any event, the Secretary intended that a calculation of the precise amounts be made by the parties, with the aid of the Grant Officer, if necessary.

The County had the burden of proving that Ms. Tucker failed to make reasonable efforts to mitigate her damages. *Cf. Hanna v. American Motors Corp.,* 724 F.2d 1300, 1306–07 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984); *Syvock v. Milwaukee Boiler Manufacturing Co., Inc.,* 665 F.2d 149, 159 (7th Cir.1981); *NLRB v. Nickey Chevrolet Sales, Inc.,* 493 F.2d 103, 107–08 (7th Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Petitioner, however, has in no way indicated that it attempted to locate Ms. Tucker in order to determine the extent of her damages or her efforts at mitigation. In view of the County's concession of liability and its failure of proof, a remand on the issue of mitigation is inappropriate in this protracted dispute.

Finally, we perceive no deficiency in the scope of the payments that may be offset against the backpay award. Petitioner has cited no authority in support of its position and we find that the Secretary's order was reasonable. As the County is at fault, it would be inappropriate to allow it to offset funds paid to Ms. Tucker by other governmental entities, as these payments would constitute benefits from a collateral source and deducting them would in effect relieve the County of its obligation to make the former employee whole. The responsibility, if any, for repayment to other governmental entities lies with Ms. Tucker. The Secretary was simply permitting the County to offset payments that it may have already made to Ms. Tucker from other sources after the layoff.

The ALJ's order concerning Ms. Tucker will be affirmed.

### VII.

In conclusion, the petition for review is denied with reference to the issues regarding (1) the Secretary's jurisdiction, (2) the maintenance-of-effort violations, (3) the disallowed costs under CETA Title VI for the 17 ineligible participants, and (4) the backpay award for Ms. Tucker. With regard to the record review, the petition for review is granted in part and the case is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's well-reasoned analysis that the 120-day time limit set forth in 29 U.S.C. § 816(b) is not a jurisdictional bar to actions taken by the Secretary of Labor after expiration of the 120-day time limit. I further concur in Sections IV, V, and VI of the opinion. However, I am unable to agree with the majority's resolution of the alleged "Maintenance of Ef-

---

has also suggested that Ms. Tucker has not been reinstated at the appropriate level; that question is not, however, before us. Similarly, the issues raised in the amicus brief filed by the Worker Rights Institute and John Kropp are not properly before us.

forts" violations discussed in Section III of the opinion. Although I agree that the majority is correct in using 1976 as the "benchmark" for purposes of analyzing whether or not there has been a "Maintenance of Efforts" by county officials in funding the local job training programs, I cannot agree that the County should be liable for the entire amount of the "shortfall" in funding since the County enacted cost-saving measures in 1977 that explains, in part, why their funding in 1977 did not match their spending efforts in 1976. Thus, I would remand this case to the administrative law judge for an accurate determination of the "shortfall" in local funding.

As set forth in the majority opinion, the non-federal funding of the local job training program for the general welfare recipients from 1976 through 1978, (the years in question) was $3,014,580 in 1976, $2,097,428 in 1977, and $2,732,487 in 1978.[1] In 1977, CETA began to fund various job training programs for general welfare recipients in Milwaukee County, budgeting approximately $1 million in 1977 for the LTE program and approximately $2.4 million for the HSH program from July 1, 1977 to June 30, 1978. These programs, local and CETA, were geared toward training general assistance welfare recipients for future employment in the private sector.

Congress in enacting the CETA program sought to create *new* employment and training opportunities for welfare recipients. *See* 20 C.F.R. § 675.1(a) (1979). In order to ensure that CETA funds were not used to replace local funding, Congress promulgated rules prohibiting "the substitution of Federal funds for other funds in connection with work that would otherwise be performed" by local government entities and providing for annual audits conducted by the Secretary of Labor. *See, e.g.,* 29 U.S.C. § 845(c)(a)(25) (1976); 29 U.S.C. § 848(a)(1) (1976); 29 C.F.R. § 99.34(b)(3).

In this manner, Congress sought to ensure that local communities maintain their effort in providing job training programs when the CETA funding became available. The majority chooses the funding level provided in 1976 as the "benchmark" or focal point to determine if Milwaukee County maintained their funding of local job training programs once CETA funds became available. It is proper to use 1976 as the focal point for purposes of comparison since 1976 is the year prior to CETA funds becoming available for job training programs for the general welfare assistance population in Milwaukee County. In 1976, the level of non-federal spending was $3,014,580, while in 1977, the year CETA funds became available, the non-federal funding dropped to $2,097,428, and rose slightly in 1978 to $2,732,487. However, based upon these figures alone, the majority concludes that there was a "shortfall" in the effort by the County to train workers under its programs. The majority agrees with the ALJ's finding that the County is responsible for the entire difference in funding, totaling $1,199,245; but the majority fails to consider much less weigh any information as to how and why these figures necessarily differ.

At least as a starting point for the purpose of analysis in establishing whether or not the County had maintained its efforts in the local job-training programs, it is proper to compare the level of spending between the years 1976, 1977 and 1978, and assessing the County $1,199,245 for the alleged CETA violation would be appropriate if the County was in fact unable to explain the reduced funding in its local program. However, for some unknown reason, the ALJ and now the majority fail to consider that the County, beginning in late 1976 and through 1977, instituted cost-saving measures in its local job-training program when it reduced the workers' wages and hours, and thus the majority

---

1. In 1978, the County's job training program, PWFP, was eliminated; the County established a job-training program entitled the Work Assistance Program ("WAP"), that was funded by the

County and the State in the amount of $2,732,487. CETA's contribution to the WAP program was approximately $200,000.

and the ALJ disregard the County's sincere efforts to operate the most cost-efficient program possible. Specifically, relying on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled Garcia v. San Antonio Metropolitan Transit Authority*, — U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the County reduced the wages and cut the hours of participants in its job training programs in an honest attempt to save taxpayers some expense in providing these programs. As the majority notes, these cost-saving measures saved the County approximately $850,000 in 1977 and as the majority admits, this figure represents 93 percent of the shortfall in funding during 1977. However, the majority refuses to take this into account in computing the potential liability of the County, and instead applies a simplistic analysis using only the gross funding figures without any inquiry whatsoever into the number of workers employed in the locally funded programs during the years in controversy, 1976 through 1978. This analysis penalizes the County for instituting cost-saving measures to save taxpayer's hard-earned dollars. The majority boldly asserts that "the proper response to the wage and hour reduction after *National League of Cities* would have been the creation of more PFWP positions ...." Thus, the majority's position is that the only way the County could avoid liability was to have increased its efforts in training more general assistance welfare recipients than it was training in the previous year. But this position does not espouse a maintenance of effort, consistent with the requirement that federal funds not be substituted for work that "would otherwise be performed" by the County, rather it requires the County to have increased its job training efforts with the employment of more workers and to have spent funds at previous year's levels regardless of whether or not it was the most cost-efficient use of taxpayer dollars. The County, on the other hand, logically

argues that it maintained its efforts in training general welfare recipients in not transferring any workers employed in the PWFP program to the CETA funded programs and in replacing those workers who left the local program, after their training was completed, with persons on the waiting list. Because the ALJ failed to make specific findings as to the number of welfare recipients employed in the program at any given time this case must in all fairness be remanded to the trier of fact to complete the record for proper review. Nevertheless, the majority penalizes the County for enacting cost-saving measures when it adopts the position that the County, with the savings accumulated through pay-cuts, was required to use the savings to employ more general assistance welfare recipients in its own program. The majority fails to cite, nor could I discover, any case law to support this gratuitous theory of federal meddling in a local budgetary decision.

Because the record before us is sparse and unclear as to the number of workers actually employed in the County job-training programs for the years in question, *see* majority n. 11,[2] this case should be returned to the ALJ to determine what portion of the County's "shortfall" in funding is explained by the County's legitimate cost-saving measures. Further, the ALJ should determine whether the County, in instituting the reduced wages and shorter hours, was able to employ more trainees or employ persons in the program for a longer period of time; thus, enabling these persons to gain more experience and remain off the assistance roles. I am convinced that in fairness to the community which implemented cost-saving measures to benefit its taxpayers, that the community should not be responsible for reimbursing the federal government for any amount of money resulting from these cost-saving efforts. In this era of reductions in government deficit spending and increased government economy caused by bureau-

---

**2.** The record contains evidence that the number of workers employed in PWFP ranged any-

where from 250 to 682 toward the end of 1977.

cratic mismanagement of the past, the majority decision penalizes a community that effectuated cost-saving and cost-efficient programs for the benefit of the welfare recipients and the taxpayers as well.

Thus, I respectfully dissent from Section III of the opinion.