## WHITE v. THOMAS.

Circuit Court of Appeals, Ninth Circuit. November 18, 1929.

Rehearing Denied February 17, 1930.

No. 5791.

Harry Holden, of Idaho Falls, Idaho, and T. C. Coffin, of Pocatello, Idaho, for appellant.

Isaac McDougall, of Pocatello, Idaho, for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

RUDKIN, Circuit Judge. The present suit was instituted by the receiver of the Bannock National Bank, of Pocatello, Idaho, against a number of the directors of the bank to recover losses sustained through excessive and improvident loans. The original decree, for varying amounts, ran against three of the directors and the personal representatives of a deceased director. From this decree, two of the directors and the personal representatives of the deceased director appealed; but since the appeal was taken one of the directors against whom the decree ran and the personal representatives of the deceased director effected a compromise with the receiver, and as to them there is a stipulation for dismissal. The case was finally submitted to this court on the appeal of director White alone, to whom we will hereafter refer as the appellant. The appellant became a director of the bank on January 13, 1921, and remained such until the bank closed its doors May 13, 1921. Many of the loans and transactions involved on the final hearing in the court below were made and took place before the appellant became a director, and with these we have no immediate or direct concern. The court found, however, that five loans made by the bank to Custer County Sheep Company, between February 16, 1921, and May 4, 1921, aggregating the sum of $9,000, and two loans made by the bank to Butterfield Bros., on January 29, 1921, aggregating $8,160, were in excess of the amounts allowed by law, that the appellant assented to these loans, and furthermore that the loans to the Sheep Company were improvidently and recklessly made.

Section 5200 of the Revised Statutes, relating to national banking associations, provides: "The total liabilities to any association of any person or of any company, corporation, or firm for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall at no time exceed 10 per centum of the amount of the capital stock of such association, actually paid in and unimpaired, and 10 per centum of its unimpaired surplus fund." Section 5239, Id., provides: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. * * * And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." 12 USCA §§ 84, 93.

As already stated, the court found that the loans above mentioned were all in excess of the amounts allowed by law; that the appellant assented to the loans, and, in effect, that in making the loans to the sheep company the appellant and other directors failed to exercise ordinary care and prudence in the supervision and management of the affairs of the bank; in other words, that the loans were imprudently and improvidently made. These findings support the decree, Bowerman v. Hamner, 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113; and the testimony supports the findings. An examination of the bank was completed at about the time the appellant became a director, and he discussed the affairs of the bank with the examiner during the course of the examination. Later the Comptroller of the Currency addressed a letter to the directors, calling their attention to the unsatisfactory condition of the institution, stating that its solvency was in danger, and said: "This report emphasizes, more than ever, the fact that President Reece is mainly responsible for the condition, due to the unwarranted extensions of credit he has made and the assistance given to banks in which he is interested. The remaining directors, however, cannot escape their responsibility to the shareholders as it is incumbent upon them to direct the affairs of the institution, and they cannot escape liability by permitting the president to dominate the bank's affairs."

Notwithstanding the warning thus given, the directors permitted Reece to remain in charge of the bank and repeatedly approved excessive loans thereafter made by him. Apparently the last loan to the sheep company was not approved by the appellant, and he may not have assented thereto, but the decree against him was amply justified on other grounds. Without doubt, the loans to the sheep company were improvidently made. Its property consisted of about 12,000 head of sheep, a ranch of 1,240 acres, together with

certain range rights in connection therewith, a quantity of hay, and some wool. The sheep were incumbered far beyond their value, and the same is in a measure true of its other property. Not long after the loans were made, the company lost all its property by foreclosure, and even lost its name and corporate existence by failing to pay the license tax imposed by the laws of the state. Of course, we should not view the situation in retrospect, but the outcome must have appeared inevitable to a man of ordinary prudence. Assuredly, no prudent man would have loaned his own money without security to a corporation in such a plight; and banking officers are vested with no broader discretion.

"Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." Martin v. Webb, 110 U. S. 7, 15, 3 S. Ct. 428, 433, 28 L. Ed. 49.

"It is the right and duty of the board to maintain a supervision of the affairs of the bank; to have a general knowledge of the manner in which its business is conducted, and of the character of that business; and to have at least such a degree of intimacy with its affairs as to know to whom, and upon what security, its large lines of credit are given; and generally to know of, and give direction with regard to, the important and general affairs of the bank, of which the cashier executes the details. They are not expected to watch the routine of every day's business, or observe the particular state of the accounts, unless there is special reason; nor are they to be held responsible for any sudden and unforeseen dereliction of executive officers, or other accidents which there was no reason to apprehend. The duties of the board and of the cashier are correlative. One side are those of an executive nature, which relate mainly to the details. On the other are those of an administrative character, which relate to direction and supervision; and supervision is as necessarily incumbent upon the board as

direction, unless the affairs of banks are to be left entirely to the trustworthiness of cashiers. Doubtless there are many matters which stand on middle ground, and where it may be difficult to fix the responsibility, but I think there is no such difficulty here. The idea which seems to prevail in some quarters, that a director is chosen because he is a man of good standing and character, and on that account will give reputation to the bank, and that his only office is to delegate to some other person the management of its affairs, and rest on that until his suspicion is aroused, which generally does not happen until the mischief is done, cannot be accepted as sound. It is sometimes suggested, in effect, that, if larger responsibilities are devolved upon directors, few men would be willing to risk their character and means by taking such an office; but congress had some substantial purpose when, in addition to the provision for executive officers, it further provided for a board of directors to manage the bank and administer its affairs. The stockholders might elect a cashier, and a president as well. The banks themselves are prone to state, and hold out to the public, who compose their boards of directors. The idea is not to be tolerated that they serve as merely gilded ornaments of the institution, to enhance its attractiveness, or that their reputations should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say such an institution would be shunned and could not endure. It is inconsistent with the purpose and policy of the banking act that its vital interests should be committed to one man, without oversight and control." Gibbons v. Anderson (C. C.) 80 F. 345, 349.

The conduct of the appellant and his fellow directors fell far short of these requirements.

The decree is affirmed.

DIETRICH, Circuit Judge, took no part.

## On Petition For Rehearing.

RUDKIN, Circuit Judge. As stated in our former opinion, the present appeal involved five promissory notes executed by the Custer County Sheep Company, aggregating $9,000, and two promissory notes executed by Butterfield Bros., aggregating $8,160. The court below found that these several loans were in excess of the amounts allowed by law and that the loans to the Sheep Company were improvidently made. We are satisfied with the conclusion heretofore announced as to the Sheep Company loans; but the testimony relating to the Butterfield Bros. loans is indefinite and unsatisfactory. At the time the two last promissory notes were executed, Butterfield Bros. were already indebted to the bank on account of other loans, evidenced by promissory notes, in excess of the amount allowed by law, so that on the face of the bank records the last two loans were excessive. But it appears from the testimony that, when the last two notes were executed, a cashier's check was issued for the amount of the two notes; that the cashier's check was retained by the bank for a period of several days; and that it was then canceled and two of the earlier notes taken up and paid. Why the transaction took this form is not explained, but there is a statement in the record, by way of recital of facts, that the last two notes were renewals only. If this be true, and the record does not show the contrary, the renewal notes did not increase the indebtedness of the makers to the bank, and the recovery of the amounts thereof against the appellant was unauthorized.

The decree of the court below will therefore be reduced to the sum of $9,000. As thus modified, the decree is affirmed, with costs to the appellant. In all other respects the petition for rehearing is denied.