**Berniece LARIMORE, Sam M. Taylor, William G. Butcher, and Orville Bottrell, Petitioners,**

v.

**C.T. CONOVER, Comptroller of the Currency, Respondent.**

**Nos. 84–1971 to 84–1974.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1985.

Decided Nov. 1, 1985.

Robert G. Heckenkamp, Heckenkamp & Simhauser, P.C., Springfield, Ill., Richard G. Hershey, Hershey, Bliss, Beavers, Periard & Romano, Taylorville, Ill., for petitioners.

Ellen Broadman, Office of the Comptroller of Currency, Washington, D.C., for respondent.

Before BAUER, Circuit Judge, COFFEY, Circuit Judge, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

Petitioners, past and present directors of the First National Bank of Mt. Auburn, Illinois, petition for review of a Decision and Cease and Desist Order issued by the Comptroller of Currency on May 11, 1984, pursuant to the provisions of 12 U.S.C. Sec. 1818(b)(1). The Comptroller's Order followed a 1982 audit of the bank which disclosed that the board of directors had, in six instances, violated the provision of 12 U.S.C. Sec. 84 which imposed lending limits upon the bank. Under the terms of the Cease and Desist Order, the petitioner directors are required to indemnify the bank for all losses incurred on account of the excessive loans.

This Court has jurisdiction over the Petition for Review, with the power to affirm, modify, terminate, or set aside the Comp-

* The Honorable Wesley E. Brown, Senior District Judge, of the United States District Court for the District of Kansas, is sitting by designation.

troller's Order, pursuant to the provisions of 12 U.S.C. sect. 1818(h)(2).[1]

The issues presented in this case include the question of whether or not 12 U.S.C.A. Sec. 1818(b)(1), which authorizes the Comptroller to order bank directors "to take affirmative action to correct the conditions resulting" from their violations of 12 U.S.C.A. Sec. 84, should encompass the requirement of proof of knowledge on the part of directors, a condition of liability found in 12 U.S.C.A. Sec. 93(a). In addition, the directors claim that the Order requiring restitution was not supported by substantial evidence; that the action of the Comptroller was arbitrary and capricious; and that the Comptroller had no jurisdiction over the director Bottrell, who resigned prior to entry of the Cease and Desist Order.

At all times relevant to these proceedings, Sec. 84 of 12 U.S.C. provided that the total obligations to any national bank of any person, partnership, association or corporation could not at any time exceed 10% of the amount of the capital stock of the bank actually paid in and unimpaired, and 10% of its unimpaired surplus fund.[2] Following an audit and report of bank examiners, which disclosed violations of the lending limits of Sec. 84, the Office of the Comptroller of Currency initiated Cease and Desist proceedings against the Bank and its Directors, pursuant to his authority under 12 U.S.C. Sec. 1818(b). That section, codified under the Federal Deposit Insurance Corporation, provides for termination of a bank's status as an insured bank. Paragraph (b) of that section provides that:

"(b)(1) If, in the opinion of the appropriate Federal banking agency, any insured bank ... or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such a bank is engaging or has engaged, or the agency has reasonable cause to believe that the bank or any directors ... or other person participating in the conduct of the affairs of such bank ... is violating or has violated ... a law, rule, or regulation ... the agency may issue and serve upon the bank or such director ... a notice of charges in respect thereof...."

\*    \*    \*    \*    \*    \*

"In the event ... the agency shall find that any violation ... specified in the notice of charges has been established, the agency may issue ... an order to cease and desist from any such violation or practice. Such order may ... require the bank or its directors ... to cease and desist from the same, *and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.*" (Emphasis supplied.)

The Cease and Desist Order on review here was entered on May 11, 1984, following hearing before an Administrative Law Judge. In issuing the Order, the Comptroller adopted some of the findings of the Administrative Law Judge, and made independent findings of fact and conclusions from the evidence adduced at the hearing, all to the effect that the directors had knowingly violated the provision of 12 U.S.C. Sec. 84 in approving loans to six different parties. The Bank was ordered not to lend money or to extend credit to any borrower in an amount exceeding the lending limits of Sec. 84, and the board of directors was ordered to "cause all loans or other extensions of credit which are in excess of the lending limitations provided in 12 U.S.C. Sec. 84 to be reduced to conforming amounts without loss to the Bank." The Board was also required to adopt poli-

---

1. "Any party to the (administrative) proceeding, or any person required by an order issued under this section to cease and desist from any of the violations or practices stated herein, may obtain a review of any order ... by the filing in the court of appeals of the United States for the circuit in which the home office of the bank is located ... a written petition praying that the order of the agency be modified, terminated, or set aside.... Upon the filing of such petition, such court shall have jurisdiction ... to affirm, modify, terminate, or set aside, in whole or in part, the order of the agency."

2. Sec. 84 has since been amended and different standards now prevail.

cies and procedures to prevent any recurrence of similar violations.

In addition, the Order required the Directors Bottrell, Butcher, Larimore, Mulberry and Taylor to indemnify the Bank, "up to their respective potential liability" for all losses that the Bank has or may incur as a result of excessive loans to the following bank customers: Bill Porter Construction Company; Twin County Trucking, Inc./Robert Varvel; Keith Montgomery; William Moore; John Thomas; and Dwight Thomas. The total potential liability for the individual directors is $1,084,883 for Bottrell, $744,053 for Butcher, $1,084,-883 for Larimore, $1,052,176 for Mulberry and $1,084,883 for Taylor.[3]

The factual background which led to the Cease and Desist Order is basically without dispute. The First National Bank of Mt. Auburn is a small, federally chartered bank located in Mt. Auburn, Illinois. In September, 1980, its board of directors consisted of Herbert Bottrell, Chris Gardner, Orville Bottrell, Berniece Larimore, Albert Mulberry and Sam Taylor. Orville Bottrell was President and the active manager of the bank, handling all loans and managing the investment portfolio of the bank. Berniece Larimore was the Cashier, and she was responsible for overall operations.

On September 9, 1980, the Office of the Comptroller began an examination of the bank, which led to the discovery that the bank's board of directors had approved loans exceeding the limitations of Sec. 84 on two separate lines of credit to William Porter and Twin County Trucking/Robert Varvel. At that time the bank examiner discussed his findings with all of the directors, and they were told of the loan limit violations and of their potential liability on illegal loans. They were cautioned to exercise more supervision over loans. The examiner's written report was discussed at a board meeting, and a copy was made available for all directors to review.

Within one month after the 1980 examination, the Porter and Varvel lines of credit were reduced to an acceptable level.

Starting in July, 1981, the board, using loan approval procedures followed from October, 1978, until July, 1982, once again approved a series of excessive loans to Porter and Varvel, as well as to four other parties, that violated the bank's loan limits. Orville Bottrell, who acted as loan officer, actually made the loans and distributed the funds. At a later board meeting, which usually was held on the first Thursday of each month, a list of the loans made during the previous month was distributed to the directors. This list contained the name of the borrower, the date of the loan, the amount of the loan and interest rate, and the due date. There was no information as to the total amount of all loans outstanding to the borrower, and no information concerning the bank's lending limits under Sec. 84 appeared on the list.

In late 1980, Herbert Bottrell resigned as director, and was no longer a member of the board. Chris Gardner resigned his position as director in December, 1981. These two persons were not parties to the administrative proceedings below.

On January 7, 1982, the petitioner William G. Butcher was appointed to fill a vacancy on the board of directors, and he was reelected, along with other directors, on January 26, 1982.

The petitioner, Orville Bottrell, who was president of the bank, resigned that office on December 31, 1982, and he was not reelected as a director on January 25, 1983. The petitioner William Butcher became president of the bank upon Bottrell's resignation, and he remained in that office at the time the petition to review was filed in this Court.

The amounts and character of the various loans which exceeded the limits of Sec. 84 are not disputed. In no way can the violations be said to have been "minimal", or inadvertent. A second examination of

---

**3.** The differences in liability are attributable to the directors' various terms of office, and/or attendance at directors' meetings when certain loans were approved.

the bank, completed on August 20, 1982, revealed excessive loans for Porter Construction, Twin County/Varvel, William Moore, Keith Montgomery, John Thomas and Dwight Thomas. A subsequent examination, completed on December 14, 1982, as well as an informal audit conducted in April, 1983, revealed that these lines of credit, except for D. Thomas, remained in excess of the lending limits of Sec. 84. One example is the Porter Construction line which became excessive on July 3, 1981 with the advancement of $11,000. Prior to that time, the balance on the Porter line of credit was $94,199. Thereafter, the balance on this line reached a total amount of *$820,982*, $543,624 of which were due to loans made after Mr. Butcher became a director.[4] As of April, 1983, $477,320 of this line of credit had been charged off as loss. The Twin County/Varvel line became excessive on June 10, 1981, by a loan of $7,200. Prior to that date, the balance was $94,874. The line was eventually increased to $183,470, $145,501 of which was extended after Mr. Butcher joined the Board.

The evidence likewise established, without dispute, that all of the excessive loans were approved by the entire board, as it existed at the time the loans were made, with no abstentions or dissenting votes.[5] There was no evidence that any director inquired about or investigated the outstanding balances on any account, although that information was readily available to each director. From such evidence, the Comptroller determined that a violation of 12 U.S.C. Sec. 84 was a knowing violation "if a director deliberately refrains from investigating that which it was his duty to investigate, or if he otherwise should have known the facts which constitute a violation of law." He further concluded that

directors Larimore, Bottrell and Taylor knowingly approved extensions of credit, including standby letters of credit, to Porter, Twin County/Varvel, Moore, Montgomery, J. Thomas and D. Thomas, in violation of 12 U.S.C. Sec. 84, and that director Butcher, likewise knowingly approved extensions of credit, including letters by credit, subsequent to January 7, 1982, to these six bank customers.[6]

■ One of the oldest laws governing lending by national banks are the lending limitations set out in 12 U.S.C. Sec. 84, which dates back to 1864.[7] Since 1864, directors who knowingly violate the limits have been personally liable under 12 U.S.C. Sec. 93 for losses sustained by the bank on excessive loans. See *Corsicana Nat. Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919). Section 93 provides that if the directors knowingly violate, or knowingly permit any violation of laws regulating banking, all rights of the banking association "shall be thereby forfeited." The violation is to be determined by a federal court in a suit brought for the purpose by the Comptroller before the bank is declared dissolved, and, "in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." In *Corsicana*, the Supreme Court recognized that a director's liability under Sec. 93 (then Sec. 5329 U.S.Rev.Stat., Comp.Stat. Sec. 9831, 6 Fed.Stat.Anno.2d Ed. p. 873) for assenting to an excessive loan was not to be based upon mere negligence since a knowing and intentional act was required. This rule was subject to the qualification, however, that if a director

---

4. The balances include standby letters of credit issued after January 7, 1982.

5. Since director Mulberry was absent from the July and August, 1981 board meetings, he was not held accountable for loans approved in his absence.

   Mulberry died after the Cease and Desist Order was made. His estate has been relieved of liability, and it is not a party to this review.

6. It was stipulated that Butcher is not liable for any unlawful extensions of credit which occurred prior to his election as a member of the board of directors.

7. R.S. Sec. 5200 derived from the Act of June 3, 1864, c. 106, Sec. 29, 13 Stat. 108, the National Bank Act.

"deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional'". 251 U.S. at 71, 40 S.Ct. at 84, 64 L.Ed. at 147. See also, Anno. 119 L.R.Fed. 606.

Apart from the power of a Court to act under Sec. 93, whenever the Comptroller believes a bank director has violated statutory lending limits, he may as in the case here, initiate administrative enforcement proceedings under 12 U.S.C. Sec. 1818(b).[8] If a violation is found, the Comptroller may order the bank, and its directors "to cease and desist" from the unlawful practice, and he may further order that affirmative action be taken "to correct the conditions resulting from any such violation or practice." Section 1818(b)(1) has been construed by the Ninth Circuit to authorize orders requiring directors to compensate for losses incurred by reason of violations of a bank's lending limits under Sec. 84. *del Junco v. Conover*, 682 F.2d 1338 (9 Cir.1982), *cert. den.* 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). There, as here, the directors argued that Sec. 1818(b) incorporates the scienter requirement of knowledge found in Sec. 93. The Court determined that even if the "knowingly" standard applies to an 1818(b) enforcement proceedings, (a question not determined)—the directors were liable because they had knowledge of the identity of the borrowers, knowledge that the proceeds were to be used by one company, and knowledge of the loan amounts and the bank's loan limits. Apparently, these directors failed to aggregate the loans, as required by Sec. 84. In *del Junco*, the Court explicitly pointed out that "(d)irectors of a national bank operate in an area closely regulated by federal law, and cannot maintain ignorance of the law as a defense." 682 F.2d at 1342.

The Petitioners seek to distinguish the *del Junco* case upon the premise that actual knowledge was present there. The petitioners Butcher and Taylor in particular claim that they had no actual knowledge of the lending limits of the bank, and no knowledge that the loans exceeded those limits. Butcher and Taylor claim that they had no prior experience as bankers, no knowledge of any letters of credit issued by Bottrell, and Taylor claims that as an "outside" director, he was entitled to rely upon the expertise of other bank officers, and had no duty to inquire as to the status of each loan applicant.

The standards of review of the Comptroller's action are established by statute and numerous decisions. Section 1818(h)(2) of Title 12 U.S.C. provides that review of the Comptroller's orders shall be "as provided in Chapter 7 of Title 5." Title 5, Sec. 706 governs our review of agency actions:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.

"The reviewing court shall—

\*  \*  \*  \*  \*  \*

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\*  \*  \*  \*  \*  \*

(E) unsupported by substantial evidence in a case ... otherwise reviewed on the record of an agency hearing provided by statute...."

The Comptroller's factual findings are to be upheld if supported by substantial evidence. *del Junco v. Conover, supra*, 682 F.2d at 1340. Because of the Comptroller's regulatory expertise, his choice of remedies

---

8. The Comptroller supervises the entire national banking system under the provisions of 12 U.S.C. Sec. 1, et seq. He has the power to charter national banks, examine their status, remove directors, and regulate all of the bank's dealings. See *Independent Bankers Ass'n v. Heimann*, 613 F.2d 1164, 1168 (D.C.Cir.1979), cert. den. 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980).

under Sec. 1818 "will not be disturbed except when the exercise is arbitrary, capricious or contrary to law." *First Nat. Bank of Lamarque v. Smith*, 610 F.2d 1258, 1264 (5 Cir.1980).

Following our review of the administrative record, and the evidence summarized above, we determine that the Comptroller's finding that the directors "knowingly" violated the lending limits of Sec. 84 is supported by substantial evidence. We further find that the Comptroller's choice of remedy in requiring the directors to compensate the bank for any losses caused by approval of excessive loans was not an arbitrary or capricious choice of remedy in that there is a clear, rational basis for a remedy which corrects the financial harm that results from the directors' unlawful conduct. The violations here were not minimal oversights or a mere failure to implement obscure banking regulations. As bank directors, the petitioners were responsible for conducting the business of the association in a safe and sound manner and in accordance with law. The directors had been previously warned of the need to comply with loan limits by the Office of Comptroller during the 1980 audit. There were no special exemptions for "new directors", or for "outside directors" with respect to their obligations to conduct the affairs of their bank in a lawful manner.

Petitioner Bottrell contends that because he is no longer a director or officer of the bank, he is not subject to the jurisdiction and orders of the Comptroller under the provisions of 12 U.S.C. Sec. 1818, since he is not a "person participating in the conduct of the affairs" of the bank. Such contention is without merit. While Bottrell was not reelected as a director on January 25, 1983, he was served with the amended Notice of Charges which initiated these proceedings on December 17, 1982, prior to the end of his term. All of the evidence establishes that he was an active director of the bank when all of the violations occurred and that he was the person who actually made all the excessive loans. The plain language of Sec. 1818 authorizes the Comptroller to issue orders against "directors ... and other persons participating in the conduct of the affairs" of the bank—not solely "current directors." Bottrell is without doubt subject to the provisions of Sec. 1818, and he can not avoid his responsibility under the law simply by resigning before a hearing was conducted on the charges.

The Order of the Comptroller is AFFIRMED.

COFFEY, Circuit Judge, dissenting.

The majority postulates that the main issues in this case are whether 12 U.S.C. § 1818(b)(1) incorporates the scienter requirement of 12 U.S.C. § 93, and whether the Comptroller's decision was supported by substantial evidence or was arbitrary and capricious. This approach overlooks a crucial preliminary issue: whether 12 U.S.C. § 1818 grants the Comptroller of the Currency the authority to order an individual director of a nationally chartered bank to personally indemnify the bank for losses resulting from the violation of 12 U.S.C. § 84. The statutes and the legislative history reveal that Congress never intended to grant the Comptroller the authority to impose such personal liability upon directors pursuant to 12 U.S.C. § 1818(b)(1), and thus I would vacate the order of the Comptroller as an act never contemplated in the legislative enactment and beyond the statutory authority of the Comptroller. *See* 5 U.S.C. § 706(2)(c). Even if I were to agree with the majority's interpretation of 12 U.S.C. § 1818(b)(1) granting authority to the Comptroller to impose personal liability upon directors, which I do not, I firmly believe that such liability cannot be imposed absent knowledge of a statutory violation on the part of the individual director. Thus, at a minimum, I would reverse the Comptroller's order with respect to Wayne Butcher, who joined the board of directors of the First National Bank of Mt. Auburn, Illinois (the "Bank") in January 1982 and had no knowledge of the 1980 warning from the Office

of the Comptroller of the Currency ("OCC")[1] to the other directors regarding their loan procedure in granting loans in excess of the limits established by 12 U.S.C. § 84.

I

The record reveals that in late 1979 and continuing into 1980, long before Butcher was appointed to the board of directors, the Bank approved loans to Porter Construction ("Porter") and Twin County Trucking Co. ("Twin County") in excess of the statutory limit set forth in Sec. 84, which, at that time, provided that the total loans to any one individual or company were not to exceed ten percent of the gross capital of the bank. *See* 12 U.S.C. § 84. In September 1980, the OCC conducted an audit of the Bank and discovered the excessive loans. In its report, the OCC admonished the bank directors that the Bank's lending procedures were sloppy and needed revision, stating, "It is necessary that directors exercise more effective supervision over the loan area." The OCC report also informed the directors that the Bank had violated the statutory lending limits in making the loans to Porter and Twin County and advised the directors of the extent of their potential personal liability for these excessive loans. In addition, the OCC bank examiner met with the then directors in September 1980 (Butcher was not a member of the board of directors at this time) and discussed the lending limit violations and the director's potential liability. Subsequently, the Bank reduced the outstanding balances of the loans and brought the loans in compliance with the ten percent lending limit for a period of time. Soon thereafter, in July 1981, before Butcher joined the board, the board of directors once more approved loans to Porter and Twin County in excess of the prescribed ten percent limit.

Butcher joined the Bank board of directors on January 7, 1982, with no knowledge of the Bank's prior excessive loans to Porter and Twin County. After this date, the board approved further additional loans to Porter and Twin County as well as additional loans in excess of the statutory limits to three other individuals.

On July 26, 1982, the OCC conducted another audit of the Bank and again discovered lending limit violations. On November 9, 1982, the OCC served the Bank board of directors with notice of the violation of 12 U.S.C. § 84 and commenced administrative proceedings to obtain a cease and desist order against them. Following a hearing pursuant to 12 U.S.C. § 1818(b)(1), an administrative law judge ("ALJ") determined that liability should be imposed upon all of the bank directors, except for Butcher, whom the ALJ found "did not know, nor … have reason to know, that he was approving loans in violation of Section 84." The ALJ found that:

> "Respondent Butcher became a member of the BOARD on January 7, 1982. He had no prior experience as a bank director. At no time before the commencement of the Bank examination on July 26, 1982, was he informed of the total amount of the line of credit extended to any borrower from the BANK. Moreover, he was not aware of the October 1980 Report of Examination before July 1982.

> \*   \*   \*   \*   \*   \*

> … [T]he record does not show that respondent Butcher was put on notice to make inquiry into the facts surrounding the approval of loans by the BOARD." (emphasis original)

The Comptroller disagreed with the ALJ's decision:

> "Mr. Butcher was under the same duty to observe the applicable law and to investigate the relevant facts as were the other directors, and he should have known that he was approving loans in violation of 12 U.S.C. § 84. In this respect, it is not a defense that Mr. Butch-

---

**1.** The OCC examiner met with the Bank directors in late September 1980 and warned them that loans to Porter Construction and Twin County Trucking Co. exceeded the legal lending limit established by 12 U.S.C. § 84.

er was new to the position, or that he was not familiar with the bank's operations."

The Comptroller assessed liability against Butcher for his action in approving loans made in excess of the statutory ten percent limits after he joined the board.

In September 1980, some eighteen months before Butcher joined the board, the OCC warned the present directors of the problem of excessive loans, and also directed the board to "exercise more effective supervision over the loan area." The record reflects that Butcher was not made aware of the warning, much less the directive, until July 1982. Only after the excessive loans had been approved by the board, including those approved by Butcher, was Butcher placed on notice of the Bank's careless loan procedures.

The record sets forth that at the time of the OCC's 1980 examination, Mr. Bottrell, the Bank president, and also the Bank's chief lending officer, would personally investigate a loan applicant and based on his approval, the loan would be granted in advance of the board's review. The Bank's procedure provided that at the next board meeting following the granting of the loan, Bottrell would advise the board of the loans he had previously made for its approval. At this time, he would submit the documentation including the borrower's name, date, amount of the loan, and the interest rate. However, the data failed to reveal the important information as to the amount of loans then outstanding to the particular individual, much less the maximum amount the bank was permitted to lend to a particular borrower pursuant to 12 U.S.C. § 84. Thus, the board entrusted Bottrell, in his position as lending officer, with the responsibility of ensuring the Bank's compliance with the applicable lending limits. The board, for reasons undisclosed in the record, either failed or refused to revise the loan procedure despite the OCC's 1980 warning and directive regarding the excessive loans and the order to "exercise more effective supervision." Consequently, this procedure for reviewing loan applicants was still operative when Butcher joined the board in January of 1982, and Butcher was unaware of the shortcomings of this procedure since he was not privy to the 1980 warning regarding the necessity of more active participation of the board in the loan approval procedure. As a result of the lack of communication from the Bank authorities, either intentional or careless, Butcher was not informed of the total amount of loans outstanding above the current lending limit under Sec. 84 at the time of the granting of the additional loans referred to.

## II

Title 12 U.S.C. Section 93(a) provides:

"If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. *Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States* in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

12 U.S.C. Sec. 93(a) (originally enacted as Act June 3, 1864, ch. 106, Sec. 53) (emphasis added).

Since 1864 the Comptroller of the Currency has been invested with the authority to file a lawsuit in Federal district court against bank directors in their individual capacity for damages resulting from their knowing violation of banking laws. Although the action of the Comptroller in the case before us is technically an order to indemnify, it has the practical effect of an

enforceable personal judgment against a director for damages sustained by the bank.[2] Thus, the Comptroller in the instant case is adjudicating the Bank directors personally liable without ever filing a lawsuit in Federal district court to "determine[ ] and adjudge[ ]" the alleged violation of 12 U.S.C. § 84.

The Financial Institutions Supervisory Act of 1966, Pub.L. No. 89–695, granted the Comptroller the authority to commence cease and desist actions against institutions in the event of a finding that a bank engaged in an unsafe or unsound banking practice or violated a law, rule, or regulation, but the statutory language does not infer, much less grant the authority to the Comptroller of the Currency to impose personal liability for damages upon bank directors. The language specifically reads: "Such order may ... require the bank and its directors, officers, employees, and agents to cease and desist from [any such violation or practice] and, further, to take affirmative action to correct the conditions resulting from any such violation or practice." *Id.* I am at a loss to understand how this language can be interpreted to grant the Comptroller the power and authority to do other than issue an immediate cease and desist order to prevent further deterioration of the financial condition of nationally chartered banks that have engaged in statutory violations or unsafe practices.

> "It is essential that the federal supervisory agencies have the statutory and administrative facility to move quickly and effectively to require adherence to the law and cessation and correction of unsafe or improper practices.... Existing remedies ... may be so time consuming and cumbersome that substantial injury

occurs to the institution before remedial action is effective."

S.Rep. No. 1482, *reprinted in* 1966 U.S. Code Cong. & Ad.News 3532, 3536. I have been unable to discover any express language in the 1966 Act, much less in the legislative history, providing the Comptroller with the authority to act unilaterally in imposing personal liability upon bank directors found to be in violation of 12 U.S.C. § 84. Instead, a proper reading of the 1966 Act and its legislative history reveals that when Congress empowered the Comptroller to issue cease and desist orders to financial institutions, its purpose was only to provide for the immediate cessation and correction of statutory violations and unsafe banking practices rather than provide for the expanded power the Comptroller has usurped in unilaterally imposing personal liability upon bank directors.

The 1978 amendment to 12 U.S.C. § 1818(b)(1) did not alter this basic purpose—to provide for the immediate cessation and correction of statutory violations and unsafe banking practices—but merely authorized the issuance of a cease and desist order if and when a bank or *"any director, officer, employee, agent, or other person participating in the affairs of such bank"* engaged in statutory violations or unsafe banking practices. Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95–630, § 107(a)(1) (1978). The 1978 amendment did increase the number of situations in which the Comptroller might exercise his authority to issue a cease and desist order, but I have been unable to discover in my research how the amendment or its legislative history might infer, much less provide any explicit language to invest the power and authority in the Comptroller to impose such personal liability on bank directors.

---

**2.** If I were to agree that the Comptroller has the authority to impose personal liability upon a director, his order would be tantamount to a judgment entered by a district court. If necessary, the Comptroller

> "may in its discretion apply to the United States district court ... for the enforcement of any effective and outstanding notice or order issued under this section, and such

courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order."

12 U.S.C. § 1818(i)(1).

Instead, the new (1978) statute merely enables the Comptroller to immediately act in an efficient and timely manner in order that he might prevent the further deterioration of troubled financial institutions. "Correctly used, ... these new powers can effectively enhance the ability of the financial institution regulatory agencies to cure unsafe or unsound situations." S.Rep. No. 323, 95th Cong., 1st Sess. 7 (1977). In interpreting the language of 12 U.S.C. § 1730(b) identical to 12 U.S.C. § 1818(b)(1), the Tenth Circuit concluded that, "The Act only permits the Bank Board to ensure that institutions conduct their affairs in a legal, safe and sound manner." *Otero Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 665 F.2d 279, 288 (10th Cir. 1981). Thus, both the legislative history and judicial interpretation of the 1978 amendment support the conclusion that the Comptroller's cease and desist power is limited to curtailing statutory violations and unsafe banking practices, but does not even mention, much less allow for the imposition of personal liability.

It should be noted that the Senate report specifically states that in a very limited situation, "where an insider has unjustly enriched himself at the expense of the institution, the [Comptroller] may find it more effective to take action directly against the individual for return of property rightfully belonging to the institution." S.Rep. No. 323, 95th Cong., 1st Sess. 7 (1977). In light of the very limited language in the Senate report referring to unjust personal enrichment, I fail to understand how the Comptroller can interpret this provision for a restitutionary remedy as the equivalent of a remedy for damages in the instant case, where there is absolutely no proof of personal enrichment. The Senate report also states, "It will be expected that this authority [to issue cease and desist orders] will be utilized only in those cases where adequate relief cannot otherwise be obtained." *Id.* Congress has provided that personal damages may only be recovered from individual directors after the institution of a lawsuit filed in the *"proper district or Territorial court,"* 12 U.S.C. § 93(a), and thus, Sec. 93 mandates a specific procedure for the Comptroller to recover damages. Although the Administrative Law Judge stated in his decision that "Section 93 is not a practicable alternative in the circumstances, because that section presupposes the ultimate dissolution of the Bank," the caselaw is to the contrary. In *Cockrill v. Cooper,* 86 F. 7 (8th Cir.1898), the court stated, "[W]e shall content ourselves with the statement that *the forfeiture of a bank's franchise,* in a suit brought by the comptroller for that purpose, *is not,* in our judgment, *a condition precedent to the maintenance of a suit against its directors for excessive loans." Id.* at 13 (emphasis added). *See also Seiden v. Butcher,* 443 F.Supp. 384, 385 (S.D.N.Y.1978). Furthermore, the Supreme Court in *Corsicana National Bank v. Johnson,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919), specifically noted, "The fact that in spite of a loss upon this transaction [excessive loan] the Bank remained solvent or even prosperous" is not a defense to an action under Sec. 5239.[3] *Id.* at 83–84, 40 S.Ct. 82, 64 L.Ed. 141. Accordingly, adequate relief can be obtained with the institution of a suit against a director pursuant to Sec. 93, and I know of no statutory language or caselaw, nor has any been presented, authorizing the Comptroller to expand a cease and desist order to include the imposition of personal liability on a director to recover damages.

With the enactment of Sec. 93, it is obvious that Congress intended that "[i]f the directors of any national banking association shall knowingly violate ... any of the provisions of this chapter, all of the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall ... be determined and adjudged by a proper district or Territorial court of the

---

**3.** Both *Cockrill* and *Corsicana* require the institution of a lawsuit to recover money damages from directors to establish liability pursuant to Sec. 5239, Rev.Stats.: the predecessor of 12 U.S.C. § 93. The language of Sec. 5239 remains intact and unaltered except for the renumbering of the statute from Sec. 5239 to 12 U.S.C. § 93.

United States in a suit brought for that purpose by the Comptroller of the Currency...." Thus, bank directors are to be adjudged personally liable only after receiving all the constitutional and legal protections accorded every citizen in a trial in a United States district court before a judge or a jury of their peers. These protections are effectively abolished and the clear intent of Sec. 93 is cast aside if Sec. 1818(b)(1) is interpreted to grant the Comptroller the authority to act as prosecutor, judge, and jury and unilaterally issue an order to an individual director to indemnify the bank. An action of this nature is tantamount to the entry of district court judgment against the director without the benefit of a trial.

It is a "well-established canon of construction that a single provision will not be interpreted so as to defeat the general purpose that animates and informs a particular legislative scheme. We ... attribute to [Congress] a general overriding intent to avoid results that would undermine or vitiate the purposes of specific provisions." *Milwaukee County v. Donovan*, 771 F.2d 983, 986 (7th Cir.1985) (citations omitted). Consequently, "when courts are confronted with statutes 'capable of coexistence, it is the duty of the courts, absent a clearly expressed Congressional intention to the contrary, to regard each as effective.'" *FAA Administrator v. Robertson*, 422 U.S. 255, 265–66, 95 S.Ct. 2140, 2149–50, 45 L.Ed.2d 164 (1975) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133–34, 95 S.Ct. 335, 353–54, 42 L.Ed.2d 320 (1974)). In 1978 when Congress amended Sec. 1818(b)(1) it neither amended nor rescinded that part of Section 93 requiring that suits for damages against individual directors be "determined and adjudged by a proper district or Territorial court." "Congress is presumed to know its own laws," *United States v. Hawkins*, 228 F.2d 517, 519 (9th Cir.1955); *see also Can-*

*non v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979); *Martin v. Luther*, 689 F.2d 109, 115 (7th Cir.1982), and in fact, when Congress amended Sec. 1818 to reach individuals, it also amended Sec. 93 by adding a subsection (b) to that statute providing for the imposition of civil penalties upon violators of federal banking statutes, without altering the prior content of Sec. 93. Thus, it is evident in the absence of a clear legislative enactment to the contrary that Congress had no intention of repealing any of the language contained in Sec. 93 of the Banking Act by implication when it amended Sec. 1818.

My research has revealed only two cases interpreting the authority of the Comptroller pursuant to Sec. 1818(b)(1) to impose personal liability upon bank directors. In *First National Bank of Eden v. Dept. of Treasury*, 568 F.2d 610 (8th Cir.1978), the Comptroller issued an order to cease and desist requiring, *inter alia*, that the president and vice-president of a bank reimburse $61,000 in bonuses paid to them. The bank challenged the validity of the order to reimburse the $61,000. The court merely recited the language of Sec. 1818(b)(1) and stated, "The requirements imposed in the order are authorized by the statute," without analyzing the law or providing any legal reasoning. 568 F.2d at 611. The order in *Eden*, however, was in the nature of an order of restitution to redress bank employees' unjust enrichment rather than damages, and the bonuses ordered to be repaid were traceable to the president and vice-president. Because *Eden* involved a case of bank employees' unjust enrichment, the action of the Comptroller in that case ordering restitution could very well be sustained and read as having been specifically contemplated by Congress as revealed in the narrow language of the Senate Report.[4] But to ex-

---

4. The decision does not recite that the bank officers in *Eden* ever asserted their right to have a court determine the right of the Comptroller to impose personal liability upon them for the alleged granting of excessive bonuses, and consequently the *Eden* court did not address this issue. Thus, *Eden* cannot be intelligently read or construed as supporting the proposition that 12 U.S.C. § 1818 provides the Comptroller with the authority to impose personal liability upon

pand that clear Congressional intent concerning situations involving a bank director's personal financial gain into a fact situation of this nature, where there is no evidence of any personal enrichment, falls of itself on a foundation of quicksand, without any case law or legal authority to support the same. In *Del Junco v. Conover*, 682 F.2d 1338 (9th Cir.1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983), the court upheld an order to directors to indemnify the bank for losses resulting from illegal loans (similar to the case at bar), but again failed to address or analyze the authority of the Comptroller to act as prosecutor, judge and jury and unilaterally impose personal liability. Thus, to date, no court has analyzed the alleged authority of the Comptroller of the Currency to issue an order imposing personal liability upon directors.

Congress intended that the Comptroller only be able to obtain damages from individual directors after a suit has been adjudicated in the United States district court pursuant to Sec. 93, where the accused is entitled to his full panoply of rights and protections. The powers granted the Comptroller pursuant to Sec. 1818 are only to be exercised to correct illegal and/or unsafe and unsound banking practices and protect the institution, the consumers, and the investors involved from further deterioration. Thus, the Comptroller exceeded the scope of this authority when he issued the order to the petitioners in this case and the order of the Comptroller must be vacated. The Comptroller, without caselaw support, much less statutory authority to support his action, has somehow read into the enabling legislation allowing him to issue cease and desist orders the alleged authority to impose personal liability upon bank directors that was never intended by Congress. Should the Comptroller determine that he needs the unilateral authority to impose personal liability without a court trial to effectively fulfill his obligations and duties, it is incumbent upon him to petition Congress for this enabling legislation and

directors without a judicial adjudication in a

let Congress be confronted with the issue of whether to cast aside the constitutional safeguards guaranteed to all United States citizens and to entrust in a single individual—the Comptroller alone—the sole responsibility and authority to act as the prosecutor, judge and jury of the officers and directors of nationally chartered banks.

## III

I disagree with the majority's analysis of 12 U.S.C. § .1818(b)(1) granting the authority to the Comptroller to impose personal liability upon directors. Furthermore, I believe the record fails to provide substantial evidence to support a finding that petitioner, Wayne Butcher, knowingly violated 12 U.S.C. § 84, and thus the Comptroller's order to Butcher to indemnify the Bank's losses should be reversed.

The OCC argues, as it did in *Del Junco*, that since it brought this action under Sec. 1818(b)(1) it need not demonstrate, as it must under Sec. 93, that the director knowingly violated the lending limits specified in 12 U.S.C. § 84. Section 1818(b)(1), as amended in 1978, provides in pertinent part, that:

> "if upon the record made at any such hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the bank *or the director, officer, employee, agent, or other person* participating in the conduct of the affair of such bank an order to cease and desist from any such violation or practice. Such order may ... require the bank or its directors, officers, employees, agents, and other persons participating in the conduct of the affairs of such bank *to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.*" (emphasis added)

The OCC relies upon the italicized statutory language and the remedial purpose

United States court of competent jurisdiction.

behind the enactment of section 1818 to support its position that the OCC need not demonstrate that a director "knowingly" approved loans, as required by Sec. 93, in excess of the statutory limit. To support his position, the Comptroller cites S.Rep. No. 323, 95th Cong., 1st Sess. 7 (1977), which discusses the application of the cease and desist proceedings to officers and directors. The report states, in part, that "where an insider has unjustly enriched himself at the expense of the institution [ ] the regulatory agency having jurisdiction over the matter may find it more effective to take action directly against the individual for return of property rightfully belonging to the institution." The Comptroller feebly attempts to expand clear Congressional intent providing the authority to issue cease and desist orders into the power to impose personal liability upon directors and argues that the Senate "expressly envisions that some of the actions taken against individuals [under section 1818 by the Comptroller] will seek compensation for losses they inflict on a bank." But the language the Comptroller relies upon in the Senate report is extremely limited and applies specifically and only to a restitutionary remedy for bank employees' unjust enrichment, and there is no evidence in this record to support the theory that any one of the Bank directors, much less Butcher, unjustly enriched himself. Further, the narrow language of the report does not cast aside a director's right to a trial in a United States district court where the accused retains his full panoply of rights and protections. In view of the OCC's inability to cite any statute or caselaw, much less significant legislative history behind the amendment to Sec. 1818(b)(1) to support such a marked departure from the enforcement policy set forth in Sec. 93 and the caselaw construing that section, it is more than merely apparent that Congress did not intend to vest in the Comptroller the all-inclusive power of imposing personal liability upon a director for loans made in excess of the statutory limit without first establishing in a court of federal jurisdiction that the director "knowingly" approved of the loans in excess of the statutory amount.

The Ninth Circuit in the *Del Junco* decision was not required to reach this issue since it found that the knowledge requirement contained in Sec. 93 was satisfied under the facts of that case. Accordingly, the *Del Junco* decision failed to address the issue of whether liability could be imposed under Sec. 1818(b)(1) without first demonstrating that the director "knowingly" approved of loans in violation of 12 U.S.C. § 84. Similarly, the majority opinion does not reach the question of whether liability may be imposed under Sec. 1818 absent a showing that the director "knowingly" approved of loans in excess of the statutory limit, since the majority holds that sufficient evidence was introduced to support the Comptroller's decision that Butcher had "knowingly" approved of loans in excess of the prescribed statutory limits.

Assuming *arguendo* that Congress did intend to grant the Comptroller the authority to issue orders imposing personal liability, the statutory terms and legislative history of Sec. 1818(b)(1) reflect that Congress did not intend to impose such liability without proof that the director knowingly violated this section. To adopt any other position would be to eviscerate Sec. 93, and a long line of cases, *see, e.g., Corsicana National Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919), imposing personal liability upon a director only when he or she has *knowingly* approved of loans in excess of the limits set forth in 12 U.S.C. § 84. The general rules of statutory construction support this position. The Comptroller's contention—that personal liability may be imposed under Sec. 1818 without first demonstrating any knowledge on the part of directors—completely disregards and casts aside the language of Sec. 93, requiring that a director must have "knowingly" approved of a statutory violation before personal liability may be assessed against him. It is axiomatic "that statutory provisions, whenever possible, should be construed so as to be consistent with each other," *Citizens to Save Spencer*

*County v. United States EPA,* 600 F.2d 844, 870 (D.C.Cir.1979), and "when courts are confronted with statutes 'capable of co-existence, it is the duty of the court, absent a clear congressional intent to the contrary, to regard each as effective.'" *Robertson,* 422 U.S. at 265–66, 95 S.Ct. 2140, 2149–50, 45 L.Ed.2d 164. As discussed in Section II above, the 1978 amendments to Sec. 1818(b)(1) do not reveal an intent by Congress to repeal Sec. 93. Section 93 provides that:

> "If the directors of any national banking association shall *knowingly* violate ... any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall thereby be forfeited. Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States in a suit brought for that purpose by the Comptroller ... before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages...." (emphasis added)

Thus, the intent of Congress as expressed in Sec. 93 prohibits the Comptroller from imposing personal liability upon a bank director unless he commences a suit in the proper district court and establishes that the director *knowingly* violated Sec. 84.

Section 93 affixes personal liability upon directors of banks who "knowingly violate ..." any of the provisions of the Banking Act while Sec. 84 of the Banking Act provides that it is unlawful for any director to participate in or assent to loans made in excess of the statutory limit. In *Corsicana,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919), the seminal case interpreting Sections 93 and 84 of the Banking Act, the Supreme Court attached a most important qualifying and limiting caveat to the determination of when a violation of the lending limit contained in Sec. 84 would be considered "knowing or intentional." The Court ruled that if a director "deliberately refrained from investigating that which it was his duty to investigate, any resulting

violation of the statute must be regarded as 'in effect intentional.'" *Id.* at 71–72, 40 S.Ct. at 84, 64 L.Ed. 141; *see also Atherton v. Anderson,* 86 F.2d 518 (6th Cir. 1936), *rev'd on other grounds,* 302 U.S. 643, 58 S.Ct. 53, 82 L.Ed. 500 (1937); *White v. Thomas,* 37 F.2d 452 (9th Cir.1930). In assessing the facts surrounding Butcher's "knowledge," we are cognizant that it is not a defense that a director does not know the law, i.e., that he did not know a bank may not lend money to any one individual or corporation in excess of the lending limit imposed by Sec. 84. *See, e.g., Del Junco,* 682 F.2d at 1342; *cf. United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971). Directors of a bank are entrusted with the absolute responsibility to maintain general supervision over the bank's affairs and cannot escape liability for losses resulting from mismanagement of the bank on the grounds that they delegated exclusive management and control of the bank to its officers. *See White v. Thomas,* 37 F.2d at 454; *see also Joy v. North,* 692 F.2d 880, 896 (2d Cir. 1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). But certainly, in a situation where the Bank president, also acting as the chief lending officer, continued to fail to advise the directors, including Butcher, of the amount of prior outstanding loans granted to the individual or corporation, a director is not responsible for losses "provided [he has] exercised ordinary care in the discharge of [his] own duty as director[ ]." *Rankin v. Cooper,* 149 F. 1010, 1013 (C.C.W.D.Ark.1907). The narrow issue in this case is whether there is sufficient evidence in the record to place Butcher, or a reasonable person acting in the capacity of bank director in his circumstances, on notice of the lending violations; or as phrased in *Corsicana,* whether Butcher had a duty to investigate the loan balances of the Bank's major accounts and whether Butcher "deliberately refrained" from investigating those balances.

Butcher overstates his case when he asserts that imposing a duty to investigate a

bank's loan balances would impose an unreasonable burden upon bank directors, especially those at large institutions. Of course, whether a duty to investigate exists will depend upon what a reasonable person acting in the capacity of a director would have done under the specific facts and circumstances of the individual case. There are certain general principles, however, that should guide bank directors in fulfilling their respective responsibilities. In particular:

> "It is the right and duty of the board to maintain a supervision of the affairs of the bank; to have a general knowledge of the manner in which its business is conducted, and of the character of that business; and to have at least such a degree of intimacy with its affairs as to know to whom, and upon what security, its large lines of credit are given; and generally to know of, and give direction with regard to, the important and general affairs of the bank, of which the cashier executes the details. They are not expected to watch the routine of every day's business, or observe the particular state of the accounts, *unless there is special reason....*"

*White v. Thomas,* 37 F.2d 452, 454 (9th Cir.1930) (quoting *Gibbons v. Anderson,* 80 F. 345, 349 (1897)) (emphasis added). "If nothing has come to the knowledge [of the directors] to awaken suspicion that something is going wrong, then ordinary attention to the affairs of the institution is sufficient. If, upon the other hand, directors know or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible." *Rankin v. Cooper,* 149 F. 1010, 1013 (C.C.W.D.Ark.1907). In large banks, the committees of the board of directors are entrusted with the responsibility of monitoring and reviewing the day-to-day transactions of the bank. Furthermore, it is incumbent upon the directors of large banking institutions that they also review the minutes of the committee responsible for reviewing loans to determine whether anything appears unusual or out of place to raise a "red flag" of warning. On the other hand, directors at smaller banks would obviously be more personally involved in the day-to-day banking operations, including a review of the bank's daily lending practices. Regardless of the size of the bank, the duty of a director is the same—to act as a reasonable director would under similar circumstances—and the failure of a director to investigate a particular loan when presented with evidence suggesting any irregularity, impropriety, or illegality of that loan may result in the director being held responsible. "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers." *White v. Thomas,* 37 F.2d at 454 (quoting *Martin v. Webb,* 110 U.S. 7, 15, 3 S.Ct. 428, 433, 28 L.Ed. 49 (1884)). Thus, a bank director has a duty to investigate the specifics of a particular loan when he knows, or under the circumstances should have been reasonably aware, of information suggesting irregularity, impropriety or illegality, and "deliberately refrain[ing] from investigating" may result in the determination of personal liability of the director.

The duty of the bank director arises the moment he or she accepts a position on the bank's board of directors, and no director may defend his or her action or inaction merely on the grounds that he or she is a novice. Recognizing the extent of a director's responsibilities, banks should provide adequate personal liability insurance coverage for the challenged acts of directors when acting within the scope of their authority and responsibility in order to attract and retain the most qualified and experienced directors who understand the nature and scope of their duties.

The Comptroller points to two events that he considers as putting Butcher on notice of the Bank's sloppy lending practic-

es, requiring Butcher to investigate the loan balances of the Bank's major accounts. First, the minutes of the Bank's board meeting for March 4, 1982, indicate concern over the Porter line of credit. The minutes disclose: "Discussions of loans to Bill Porter Construction with common agreement that all future transactions be closely observed. Present contract proceeds should reduce obligations." The second incident occurred early in 1982, soon after Butcher joined the board, when Butcher learned that a Dwight Thomas, whose outstanding loan balance, unknown to Butcher, exceeded the statutory limit, had declared bankruptcy. These two incidents, of themselves, certainly are insufficient to place Butcher on notice of the scope of the problems with the overall lending practices of the Bank to find that Butcher had a duty to investigate the specifics of the loans in question. The record discloses that Butcher, a new director, had no knowledge whatsoever of the OCC's 1980 warnings to the other directors concerning the Bank's previous violations of the statutory lending limits, nor of the Bank's sloppy lending procedures, nor of the OCC directive to increase board supervision over loans. The excess loans for which Butcher is now being held liable were granted in the first six months of his tenure, specifically between January 1982 and July 1982. As noted above, the fact that Butcher was a new director does not mean that he is held to a lesser standard than the continuing directors; it does mean, however, that the holdover directors had intimate knowledge of the facts, circumstances, and warning unknown to Butcher. Specifically, Butcher had no knowledge of the contents of the OCC's 1980 report: (1) that the Bank had previously extended loans to Porter in excess of the statutory limit; (2) that the OCC had directed the Bank to "exercise more effective supervision over the loan area;" (3) that the lending staff was inadequate; and (4) the extent of directors' potential personal liability for statutory violations. Thus, the discussion at the March, 1982, board meeting that "future transactions" with

Porter "be closely observed" certainly would put a holdover bank director, with knowledge of the Bank's prior loans to Porter in excess of the statutory lending limits, on notice to investigate that account, and the failure to investigate might very well be considered a "deliberate" violation of that duty if another loan had been made to the same individual or corporation. Yet, that same discussion certainly would not have had the same impact on Butcher, who had no knowledge of the OCC's previous warning concerning excess loans to Porter, and in the judgment of a reasonable person, the facts surrounding the loan transaction might very well be deemed insufficient to place Butcher on notice to investigate. Dwight Thomas' declaration of bankruptcy clearly put Butcher on notice to investigate future loans to Thomas; however, no loans were extended to Thomas after the fact of his bankruptcy became known to Butcher and thus the problem did not arise.

From the facts in the record, it is obvious that the Comptroller measured Butcher's conduct by a different standard than that used to measure the other Bank directors' conduct in that the OCC had warned the other directors in 1980 that certain loans violated 12 U.S.C. § 84, informed the directors of their potential personal liability, directed the board to "exercise more effective supervision over the loan area," gave no directive to warn newly appointed directors of the problems in the loan area, and further allowed the continuing directors a two year grace period to get the Bank's loan policies and procedures in compliance with federal law before conducting a second audit. The directors, after receiving this warning, temporarily reduced the offending loans beneath the statutory limit, but either failed or refused to implement the OCC's directive to increase board supervision over loan approval. Consequently, in 1982 when the OCC found that the Bank had again violated 12 U.S.C. § 84 by extending loans in excess of the legal lending limit, and also found that the board had done nothing to improve control over loan approval, the Comptroller's order to the

continuing directors to indemnify the Bank's losses resulting from the illegal loans would certainly have been appropriate and fully justified, if the Comptroller had had such authority to issue the order, when considering the fact that the continuing directors had been previously warned and disregarded that warning. Indeed, counsel for OCC in his opening remarks at the hearing before the ALJ stated, "In each case, I believe our case will show extensions of credit constituting these violations had been approved by the board of directors, *by the very directors that had been warned and cautioned and instructed in 1980 to correct these very same violations.*" (emphasis added) Butcher to date has never received the same benefit of a warning, much less been "cautioned and instructed," and in fact he had no knowledge of the 1980 OCC report containing the warning to the holdover directors; yet the Comptroller still ordered Butcher to indemnify the Bank's losses without having given him the benefit of the doubt and the same opportunity of a warning and time to comply with the warning that the other directors received. The Comptroller thus employed a double standard in finding Butcher personally liable, as he reversed the finding of the ALJ, who determined that there were insufficient facts in the record to support a finding that Butcher possessed the necessary knowledge to place him on notice to further investigate the loans approved by the Bank board of directors.

When reviewing an agency's decision, "a court must set aside agency decisions that are 'unsupported by substantial evidence.'" *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.1983); *see also Steadman v. SEC,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981); *Del Junco,* 682 F.2d at 1340. In this case, the Comptroller rejected the finding of the ALJ who presided over the hearing that Butcher "did not

know, nor ... have reason to know" that he approved loans violating 12 U.S.C. § 84.

"The standard [of review] does not change merely because the final decision rejects the ALJ's determinations. The decision for court review is that of the agency.... The court does not review the ALJ's decision which is merely part of the record.

But the court must take into account the 'whole record.' Because the ALJ's factual findings are part of the record, contrary agency findings are given less weight than they would otherwise receive."

*Saavedra,* 700 F.2d at 498 (citations omitted); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Mattes v. United States,* 721 F.2d 1125, 1129 (7th Cir.1983). It is obvious, when considering the record as a whole in this case, including the ALJ's clear and unambiguous finding that Butcher was not "put on notice to make inquiry into the facts surrounding the approval of loans by the BOARD," that the record fails to provide substantial evidence that Butcher was placed on notice as to the problems with the Bank's lending practices, or that he *"deliberately refrained* from investigating that which it was his duty to investigate...." Thus, the record does not support the Comptroller's conclusion that Butcher *knowingly* violated 12 U.S.C. § 84. Since the Comptroller can only recover personal damages from a bank director after a court with federal jurisdiction has determined that the director knowingly violated Sec. 84, I would vacate the order of the Comptroller imposing personal liability upon the directors as an act beyond the scope of the Comptroller's authority. Furthermore, I would agree with the decision of the ALJ and dissent from that portion of the majority's opinion imposing liability on Butcher.[5]

---

5. The majority finds that "the Comptroller's choice of remedy in requiring the directors to compensate the bank for any losses caused by approval of excessive loans was not an arbitrary and capricious choice of remedy in that there is a clear, rational basis for a remedy which corrects the financial harm that results from the director's unlawful conduct." *Supra* at 896. "The reviewing court must first decide whether the agency acted within the scope of its statu-

tory authority. If it has, the court must then determine whether its actual choice was 'arbitrary, capricious, or otherwise not in accordance with law.'" *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 713 (8th Cir.1979) (citations omitted). As I believe the Comptroller does not possess the statutory authority to unilaterally impose personal liability for damages on directors, I do not reach the issue of whether the Comptroller's action in this case is arbitrary and capricious.